[Crim. No. 16690. In Bank. Mar. 14, 1974.]

In re ROBERT NATHAN FOSS on Habeas Corpus.

**COUNSEL**

Ezra Hendon, under appointment by the Supreme Court, for Petitioner.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Charles P. Just, Roger E. Venturi and Willard F. Jones, Deputy Attorneys General, for Respondent.

**OPINION**

**BURKE, J.**—Robert Nathan Foss was convicted following a jury trial in the Humboldt County Superior Court of five counts of furnishing heroin in violation of Health and Safety Code section 11501 (now § 11352).[1]

[1] Health and Safety Code section 11501 provided: "Except as otherwise provided in this division, every person who transports, imports into this State, sells, furnishes, administers, or gives away, or offers to transport, import into this State, sell, furnish, administer, or give away, or attempts to import into this state or transport any narcotic other than marijuana, except upon the written prescripion of a physician, dentist, podiatrist, or veterinarian licensed to practice in this State, shall be punished by imprisonment in the state prison [for a period of] five years to life and shall not be eligible for release upon completion of sentence or on parole, or any other basis until he has been imprisoned for a period of not less than three years in the state prison.

"If such person has been previously convicted once of any felony offense de-

Outside the presence of the jury, petitioner admitted a prior conviction for possession of heroin in violation of Health and Safety Code section 11500 (now § 11350). His prior conviction occurred in November 1957, 14 years before the current charges. That conviction, however, caused petitioner to be sentenced under section 11501 to state prison for a term of 10 years to life, without possibility of parole for a period of not less than 10 years. Absent the provision of section 11501 precluding parole for 10 years, petitioner would be eligible for parole consideration after serving one-third of his minimum sentence. (Pen. Code, § 3049.)

The judgment was affirmed on appeal in an unpublished opinion. (*People v. Foss*, 1 Crim. 10134), and no petition for hearing was filed. We took this case to consider petitioner's contention that the provisions precluding parole consideration for the mandatory minimum term contained in section 11501 constitute cruel or unusual punishment in violation of article I, section 6, of the California Constitution.[2] ▮ Although the issue was raised and rejected on appeal, the question is cognizable on habeas corpus because petitioner alleges that he is being detained under a sentence which

scribed in this division or Section 11911, 11912, or 11913 [relating to the possession, possession for sale, and unlawful sale, transportation, etc., of certain restricted dangerous drugs (now §§ 11378-11380)] or of any offense under the laws of any other state or the United States which, if committed in this state, would have been punishable as a felony offense described in this division or Section 11911, 11912, or 11913, the previous conviction shall be charged in the indictment or information and, if found to be true by the jury upon a jury trial or by the court upon a court trial or if admitted by the person, he shall be imprisoned in the state prison for a period of 10 years to life and shall not be eligible for release upon completion of sentence or on parole or any other basis until he has been imprisoned for a period of not less than 10 years in the state prison.

"If such person has been previously convicted two or more times of any felony offense described in this division or Section 11911, 11912, or 11913 or of any offense under the laws of any other state or the United States which, if committed in this state, would have been punishable as a felony offense described in this division or Section 11911, 11912, or 11913, the previous convictions shall be charged in the indictment or information and, if found to be true by the jury upon a jury trial or by the court upon a court trial or if admitted by the person, he shall be imprisoned in the state prison for a period of 15 years to life and shall not be eligible for release upon completion of sentence or on parole or any other basis until he has been imprisoned for a period of not less than 15 years in the state prison."

Section 11352 contains substantially the same provisions.

Unless otherwise indicated, all references are to the Health and Safety Code.

[2]Article I, section 6, of the California Constitution states: "All persons shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed; nor shall cruel or unusual punishments be inflicted. Witnesses shall not be unreasonably detained, nor confined in any room where criminals are actually imprisoned."

violates his fundamental constitutional rights. (*In re Masching,* 41 Cal.2d 530, 532 [261 P.2d 251].)

 We have concluded that the provisions of section 11501 and its successor, section 11352, precluding parole consideration of a repeat offender for a minimum of 10 years constitute both cruel and unusual punishment under article I, section 6, of our Constitution. Since the mandatory minimum feature of section 11501 precluding the possibility of parole for the minimum term is severable from the remainder of the statute, however, the 10 year-to-life sentence under which petitioner is incarcerated remains valid.[3]

## I.

 We note at the outset "that in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and that such questions are in the first instance for the judgment of the Legislature alone." (*In re Lynch,* 8 Cal.3d 410, 414 [105 Cal. Rptr. 217, 503 P.2d 921].) This legislative power is limited, however, by the terms of article I, section 6, of the California Constitution. As we stated in *People* v. *Anderson,* 6 Cal.3d 628, 640 [100 Cal.Rptr. 152, 493 P.2d 880], "The cruel or unusual punishment clause of the California Constitution, like other provisions of the Declaration of Rights, operates to restrain legislative and executive action and to protect fundamental individual and minority rights against encroachment by the majority. It is the function of the court to examine legislative acts in light of such constitutional mandates to ensure that the promise of the Declaration of Rights is a reality to the individual. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 141 . . . .) Were it otherwise, the Legislature would ever be the sole judge of the permissible means and extent of punishment and article I, section 6, of the Constitution would be superfluous."

We proceed, therefore, to fulfill our constitutional obligation to inquire whether the sentence imposed upon petitioner pursuant to Health and Safety Code section 11501 violates his rights under article I, section 6, of the Constitution.

Petitioner contends through his appointed counsel that the mandatory minimum feature of Health and Safety Code section 11501 which precludes

[3]The views expressed in this opinion apply with equal force to the provision of section 11501 and its successor, section 11352, precluding parole consideration of a third time offender for a minimum of 15 years. We express no opinion, however, as to the validity of the three-year minimum term during which a first offender is ineligible for parole consideration.

parole consideration for a minimum of 10 years is "cruel, as applied to him, because it is grossly disproportionate to the offense he committed, and is unusual when compared with California sentencing procedure and with the law of other jurisdictions." Petitioner, through counsel, expressly disavows any contention that the 10 year-to-life term set forth in section 11501 is cruel or unusual and limits his attack to the provision precluding parole consideration for a minimum period of 10 years.

As noted above, petitioner was convicted of five counts of selling or furnishing heroin. The record shows that on five separate occasions petitioner furnished heroin to Leroy Holmes, a former supplier for petitioner, who had agreed to assist the police after having been arrested for selling sugar in lieu of heroin. On each such occasion, petitioner went with Holmes to secure the narcotic from petitioner's current supplier. Petitioner testified that initially he refused to acquire heroin for Holmes but reluctantly agreed to do so because Holmes was going through pain from "withdrawals." Petitioner's version was corroborated by the testimony of his wife who was present in petitioner's home when he was approached by Holmes. Holmes testified that petitioner readily agreed to furnish him with heroin but Holmes admitted that he was addicted to heroin and suffering from withdrawal when he approached petitioner. Petitioner's testimony that he was also addicted to heroin and suffering from withdrawal at the time of the sales to Holmes is uncontradicted in the record. It is also uncontradicted that the sole consideration received by petitioner for furnishing heroin to Holmes was enough of the narcotic for a single fix on three of the five occasions on which the transactions occurred. Petitioner testified further that he had never sold heroin for "profit" and stated on cross-examination by the prosecution that he had not furnished heroin to anyone prior to the transactions with Holmes.[4]

The inquiry into the provision prohibiting parole consideration for a minimum of 10 years begins with this court's recent holding in *In re Lynch, supra,* 8 Cal.3d 410, that a term of life imprisonment for a second offense of indecent exposure (Pen. Code, §§ 314, 671), violated article I, section 6, of our Constitution. ■ We concluded (p. 419) that "when a defendant under an indeterminate sentence challenges that sentence as cruel or unusual punishment in violation of the California Constitution,

---

[4]The exchange on cross-examination by the prosecution was as follows: "Q. Did you ever in your life—had you ever in your life gotten any heroin for anybody like this, similar situation? A. No. As a rule I just cop for myself. There have been times when I was young like on the streets like in Los Angeles and I would be short of money and maybe two or three of us would put our bread together to go cop a gram or something to divide up among us, but I have never actually . . . ." (At this point the prosecutor interrupted with another question.)

the test is whether the maximum term of imprisonment permitted by the statute punishing his offense exceeds the constitutional limit, regardless of whether a lesser term may be fixed in his particular case by the Adult Authority."

█ The fact that a defendant imprisoned under an indeterminate sentence might be released by the Adult Authority prior to the expiration of the maximum term prescribed by law does not, therefore, affect the question whether that term constitutes cruel or unusual punishment. In the instant case, however, because of the provision prohibiting parole consideration for the minimum period of 10 years prescribed by section 11501, there is no possibility that petitioner will be released during the first 10 years of his incarceration. █ Although we were concerned with the maximum term in *Lynch,* we thus made it clear that where a minimum sentence is found to violate article I, section 6, of the Constitution, the "defendant will be entitled to relief without regard to the constitutionality vel non of the maximum." (*In re Lynch, supra,* 8 Cal.3d 410, 419, fn. 9.) Petitioner's contention that the provision prohibiting parole consideration for the minimum period of 10 years is both cruel and unusual can therefore be considered without regard to the constitutional validity of the life maximum term. Furthermore, since it is solely the provision precluding parole consideration for the minimum term that is challenged by petitioner, we need not consider at this time whether the maximum term of life imprisonment imposed by section 11501, or its successor section 11352, is cruel or unusual punishment.

█ In *In re Lynch, supra,* 8 Cal.3d 410, 420-424, we reviewed the cases interpreting article I, section 6, of our Constitution and similar constitutional provisions in other jurisdictions and concluded that "in California a punishment may violate article I, section 6, of the Constitution if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Id.* at p. 424.) █ We then ascertained from the case law three distinct techniques used in determining whether a punishment is disproportionate to the offense.

The first such technique involves an examination of the nature of the offense and/or the offender, with particular regard to the degree of danger both present to the society. (8 Cal.3d at p. 435.) Relevant to this inquiry are the facts of the crime in question, the nonviolent nature of the offense, and whether there are rational gradations of culpability that can be made on the basis of the injury to the victim or to society in general. Although not mentioned in *Lynch,* also relevant is a consideration of the penological

purposes of the prescribed punishment. (See, e.g., *People* v. *Anderson, supra,* 6 Cal.3d 628, 651-653; *People* v. *Lorentzen,* 387 Mich. 167 [194 N.W.2d 827, 833].)

The second technique set forth in *Lynch* involves a comparison of the questioned punishment with punishments imposed within the same jurisdiction for offenses which may be deemed more serious than that for which the questioned punishment is imposed. We stated that the underlying assumption behind this test "appears to be that although isolated excessive penalties may occasionally be enacted, e.g., through 'honest zeal' (*Weems* v. *United States* (1910) . . . 217 U.S. 349, 373 . . .) generated in response to transitory public emotion, the Legislature may be depended upon to act with due and deliberate regard for constitutional restraints in prescribing the vast majority of punishments set forth in our statutes. The latter may therefore be deemed illustrative of constitutionally permissible degrees of severity; and if among them are found more serious crimes punished less severely than the offense in question, the challenged penalty is to that extent suspect." (*In re Lynch, supra,* 8 Cal.3d 410, 426.)

The third measure of disproportionality described in *Lynch* involves a comparison of the challenged penalty with punishments prescribed in other jurisdictions for the same offense. The basis of this test is explained as follows: "Here the assumption is that the vast majority of those jurisdictions will have prescribed punishments for this offense that are within the constitutional limit of severity; and if the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness." (*In re Lynch, supra,* 8 Cal.3d 410, 427.)

Applying the foregoing analysis to the instant case, we conclude that the provision precluding parole consideration for the minimum period of 10 years is both cruel (in terms of the additional punishment imposed without regard to the character of either the offender or the offense) and unusually excessive (when compared both with punishments imposed in California for more serious crimes and with punishments imposed by other jurisdictions upon the same class of offenders).

### 1. *The Nature of the Offense and the Offender*

First, the nature of the offense and the offender with which we are concerned do not warrant the imposition of a prison term which absolutely precludes parole consideration for a minimum period of 10 years.

Heroin is an opiate-based drug which causes a strong psychological and

physiological addiction, or drug dependence, through continued use.[5] We have no doubt that heroin abuse presents a serious problem to our society[6] or that harsh penalties may be necessary to restrict the supply, sale and distribution of this substance. In enacting additional penalties for repeated offenses, however, consideration should be given to the particular circumstances of the offenses committed, such as the quantity of narcotics involved, and whether the transactions were those of an addict to support his habit, as is the case here, or were sales for profit made by other suppliers of heroin. (Cf. *People* v. *Lorentzen, supra,* 194 N.W.2d 827, 831, relied upon by this court in *In re Lynch, supra,* 8 Cal.3d 410; see also *Weems* v. *United States, supra,* 217 U.S. 349, 379-380 [54 L.Ed. 793, 803-804, 30 S.Ct. 544].)

The United States Supreme Court recognized in 1925 that opiate addiction was a disease subject to proper medical treatment. (*Linder* v. *United States,* 268 U.S. 5, 18 [69 L.Ed. 819, 823, 45 S.Ct. 446, 39 A.L.R. 229].) Thirty-six years later, in *Robinson* v. *California,* 370 U.S. 660, 667 [8 L.Ed.2d 758, 763, 82 S.Ct. 1417], the court again asserted that opiate addiction was an illness and struck down a California statute prescribing criminal sanctions for the status of narcotics addiction on the ground that such punishment was cruel and unusual in violation of the Fourteenth Amendment to the United States Constitution. The court's holding in *Robinson* has subsequently been interpreted as precluding criminal punishment of an individual because of a particular status, i.e., addiction, but allowing the imposition of criminal sanctions for the acts of use, possession or sale of contraband even though necessary to support an addictive habit, as well as sanctions for disorderly public conduct by the addict while under the influence of the addicting substance.[7] (Cf. *Powell* v. *Texas,* 392

---

[5]One researcher has summarized this addiction as follows: "Of all the drugs of abuse the opiates present the most complex set of problems. It is hard to motivate the opiate user to abstain because the drug produces a state of total drive satisfaction in the user: nothing needs to be done because all things are as they should be. At the same time, the physiological and psychological dependence force the opiate dependent person to extreme measures to obtain the drug." (Arthur D. Little, Inc., Drug Abuse and Law Enforcement, Submitted to the President's Commission on Law Enforcement and Administration of Justice (1967) p. S-1.)

[6]See The National Commission on Marihuana and Drug Abuse, Drug Use in America: Problem in Perspective, U.S. Government Printing Office (1973) page 144.

[7]In *Robinson,* the court distinguished punishment for the status of addiction from other permissibly punishable offenses as follows: "This statute, therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment: Rather,

U.S. 514, 533 [20 L.Ed.2d 1254, 1267-1268, 88 S.Ct. 2145]; *In re Smith,* 2 Cal.3d 508, 510 [86 Cal.Rptr. 4, 467 P.2d 836]; *In re Carlson,* 64 Cal.2d 70, 72 [48 Cal.Rptr. 875, 410 P.2d 379].) In *Powell* (pp. 531-532 [20 L.Ed. 2d at p. 1267]), the court stated that the primary purpose of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution "has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes; the nature of the conduct made criminal is ordinarily relevant only to the fitness of the punishment imposed."

It has been held, generally in the context of habitual criminal statutes (e.g., Pen. Code, § 644), that increased penalties for subsequent offenses are attributable to the defendant's status as a repeat offender and arise as an incident of the subsequent offense rather than constituting a penalty for the prior offense. (See *Graham* v. *West Virginia,* 224 U.S. 616, 623-624 [56 L.Ed. 917, 920-921, 32 S.Ct. 583]; *People* v. *Stanley,* 47 Cal. 113, 116-117; see also 39 Am.Jur.2d, Habitual Criminals, etc., §§ 1, 2, 5, pp. 308-311, and cases cited therein.) Such status arises from the repetition of overt acts which have been proscribed as criminal conduct. Although each of the overt acts for which the drug offender is convicted may be independently proscribed, nevertheless, to the extent that repetition of the acts is attributable solely to a psychological and/or physiological compulsion arising from an addiction to contraband, any increased punishment for a further offense can be attributed to the offender's status as an addict and may thus be deemed to constitute punishment for such status.[8]

It follows that the aggravated penalty imposed by section 11501 falls somewhere between the prohibition of sanctions for status announced in *Robinson* v. *California, supra,* 370 U.S. 660, and the subsequent holding of *Powell* v. *Texas, supra,* 392 U.S. 514, allowing punishment for overt acts even though the result of an addiction. Under the rationale of *Powell,* however, the increased punishment of section 11501 for the repetition of punishable overt acts is not prohibited outright by *Robinson.* Each separate

---

we deal with a statute which makes the 'status' of narcotic addiction a criminal offense, for which the offender may be prosecuted 'at any time before he reforms.' California has said that a person can be continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of an antisocial behavior there." (370 U.S. at p. 666 [8 L.Ed. 2d at pp. 762-763].)

[8]To the extent, of course, that the addict sells contraband for purposes of monetary or other gain above and beyond that necessary to support his addiction, the repetition of the addict's violation of laws barring the sale and possession of such contraband is not solely attributable to his addiction. An increase in punishment for such repetition, therefore, is not attributable solely to his status as an addict.

offense involves a punishable *actus reus* and the repetition of such acts provides a basis other than status upon which to impose sanctions. (Cf. *Powell* v. *Texas, supra,* 392 U.S. 514, 533.) The rationale of *Robinson,* however, that it is both cruel and unusual punishment to impose criminal sanctions upon the status of addiction, adds a compelling consideration to the determination of whether the provision precluding parole consideration for the minimum period of 10 years, as applied to an addict who participates in transactions involving the procuring, furnishing or selling of heroin to support his habit, is a fitting punishment under article I, section 6, of the California Constitution. ■ Measured from the evolving standards of decency that mark the progress of a maturing society (*Trop* v. *Dulles,* 356 U.S. 86, 101 [2 L.Ed.2d 630, 642-643, 78 S.Ct. 590]; *People* v. *Anderson, supra,* 6 Cal.3d 628, 647), as they are espoused in *Robinson,* the mandatory minimum term precluding parole consideration for 10 years is thus cruel in its failure to consider the extent to which the addict's repetition of proscribed behavior is attributable to his addiction.

In addition, as pointed out above, also relevant to determining whether a sentence is disproportionate to the offense and offender, is a consideration of the penological purposes of the punishment imposed in light of the particular offense. In *People* v. *Lorentzen, supra,* 194 N.W.2d 827, 834, the court struck down a mandatory 20-year minimum term for sale of marijuana, stating: "A compulsory sentence of 20 years for a nonviolent crime imposed without consideration for the defendant's individual personality and history is so excessive that it 'shocks the conscience.'" The provision precluding consideration for parole for the minimum term of 10 years without consideration for either the offender or his offense is no less shocking.

■ It is well established that the purpose of the indeterminate sentence provisions in California's criminal law is to mitigate the punishment which would otherwise be imposed upon the offender. (*In re Lynch, supra,* 8 Cal.3d 410, 416; *In re Lee,* 177 Cal. 690, 692 [171 P. 958].) More importantly, as stated in *Lee* (pp. 692-693), "These laws place emphasis upon the reformation of the offender. They seek to make the punishment fit the criminal rather than the crime. They endeavor to put before the prisoner great incentive to well-doing in order that his will to do well should be strengthened and confirmed by the habit of well-doing. Instead of trying to break the will of the offender and make him submissive, the purpose is to strengthen his will to do right and lessen his temptation to do wrong." These principles are especially applicable in the case of a drug dependent addict with whom the period of incarceration can potentially be used to lessen the psychological and physiological compulsion exerted upon him by the addicting substance. These lofty ideals are thwarted,

however, by the provision of section 11501 precluding parole consideration for a minimum of 10 years. Thus, even though the offender may have suffered a second conviction because of his addiction, once he has been able to overcome that addiction or show a real promise of rehabilitation and of being able to remain free of further narcotic usage he may not be tried under parole supervision but must still remain in prison until the expiration of the mandatory 10-year period. This hardly serves as an impetus towards "well-doing" on the part of the prisoner.

As pointed out further in *People* v. *Lorentzen, supra,* 194 N.W.2d 827, 833: "Experts on penology and criminal corrections tend to be of the opinion that, except for extremely serious crimes or unusually disturbed persons, the goal of rehabilitating offenders with maximum effectiveness can best be reached by short sentences of less than five years' imprisonment." ▮ Thus, where rehabilitation of the offender is of primary importance, the mandatory provision precluding parole consideration for the 10-year minimum period as provided by section 11501 is clearly excessive. Recommending against the imposition of mandatory minimum sentences, the President's Commission on Law Enforcement and Administration of Justice states: "Within any classification of offenses, differences exist in both the circumstances and nature of the illegal conduct and in the offenders. Mandatory provisions deprive judges and correctional authorities of the ability to base their judgments on the seriousness of the violations and the particular characteristics and potential for rehabilitation of the offender." (The Challenge of Crime in a Free Society, GPO (1967) p. 223.) A similar conclusion was derived in 1963 by the President's Advisory Commission on Narcotic and Drug Abuse which recommended that mandatory minimum sentences that prohibit probation or parole be amended to fit the gravity of the particular offense so as to provide a greater incentive for rehabilitation. (The President's Advisory Commission on Narcotic and Drug Abuse: Final Report (Nov. 1963) pp. 41-42.) The 1963 commission drew a line between offenses involving the sale or importation of a small amount of contraband and those committed by major dealers in illegal substances, stating that the more severe penalties precluding parole or probation for the latter class are acceptable. These conclusions strengthen our determination that the provision against parole consideration for the minimum term of 10 years as imposed by section 11501 is excessive.

▮ We recognize that rehabilitation is not the only purpose behind the imposition of punishment by imprisonment for criminal offenses. In *People* v. *Anderson, supra,* 6 Cal.3d 628, 651-652, we noted two additional legitimate purposes of the penal laws; isolation of the offender from the

society, and deterrence. Neither of these purposes, however, is sufficient to overcome the excessive severity of the statute under attack.

 With respect to isolation from the society, if the offender presents a danger to society, it is clearly within the discretion vested in the Adult Authority to refuse to grant parole until such time as the offender has become rehabilitated even if this means holding him for the maximum period of life imprisonment. (Cf. *In re Minnis,* 7 Cal.3d 639, 644 [102 Cal.Rptr. 749, 488 P.2d 997].) The imposition of the provision precluding parole consideration for the minimum term of 10 years does not, therefore, afford any extra protection from a dangerous offender to society than is otherwise available under the indeterminate sentence law. On the contrary, by hindering the Adult Authority's ability to tailor the punishment to fit the rehabilitative progress of the particular offender, the provision precluding parole consideration increases the cost to the society of the offender's incarceration both in terms of the dollar cost of a longer imprisonment and in terms of the ill effects suffered by offenders from unduly long periods of imprisonment.

Nor do we perceive how the provision in question acts as a deterrent to the addict driven to commit a subsequent offense by the psychological and physiological compulsions attendant to his addiction. Even if such deterrence may be shown to exist, however, the increased punishment attributable to repetitive involvement with controlled substances by the addict remains no less cruel and excessive.

## 2. *Disproportionality: California Provisions*

Applying the second prong of the analysis described in *In re Lynch, supra,* 8 Cal.3d 410, 426-427, it also appears that the provision in question for second offenders provided by section 11501 is unusual in its severity when compared with punishments imposed in California upon perpetrators of more serious crimes, including second offenders. According to the compilation of penalties submitted in this case by the Attorney General, there are very few situations in which an offender is denied the possibility of parole for a period as long as 10 years. Apart from the limited offenses for which a term of life imprisonment without the possibility of parole is prescribed,[9] and excluding the penalties for drug-related offenses discussed below, the only instances in which an offender is subject to a mandatory

---

[9]These include kidnapping for the purpose of ransom, extortion or robbery with bodily harm (Pen. Code, § 209), attempted or actual train wrecking (Pen. Code, §§ 218, 219).

minimum term of 10 years or more involve the 12-year mandatory minimum terms imposed upon habitual criminals who have been convicted of specifically enumerated violent or morally reprehensible felonies with *three* separately tried prior convictions of similar serious felonies (Pen. Code, §§ 644, subd. (b), and 3048.5),[10] and the 10-year mandatory minimum term imposed upon those offenders convicted at one trial of 2 or more felonies the minimum sentences of which aggregate more than 10 years (Pen. Code, § 3024, subd. (d)). Each of these situations clearly present more serious violations of the penal laws than does the sale of a small quantity of heroin by an addict to support his habit.

In addition, persons convicted for the second time of first or second degree murder (Pen. Code, § 190), robbery with great bodily injury (Pen. Code, § 213), burglary with great bodily injury (Pen. Code, § 461), burglary with explosives (Pen. Code, § 464), rape with great bodily injury (Pen. Code, § 264), arson on a dwelling (Pen. Code, § 447a), assault with intent to commit murder (Pen. Code, § 217), assault with a deadly weapon (Pen. Code, § 245), kidnapping (Pen. Code, § 208), escape from jail or prison with force (Pen. Code, §§ 4530, subd. (a), 4532, subd. (a)), or lewd or lascivious acts upon a child under 14 (Pen. Code, § 288) are all eligible for parole consideration *before* one convicted of a violation of section 11501 with a prior drug-related offense. More significantly, before a person convicted of any of the above listed felonies will incur a mandatory minimum term of *nine years,* he must have been previously *twice convicted* in separate trials of similar serious felonies. (Pen. Code, §§ 644,

---

[10]The offenses giving rise to a 12-year mandatory minimum term are listed in Penal Code section 644, subdivision (b), which provides: "Every person convicted in this State of the crime of robbery, burglary of the first degree, burglary with explosives, rape with force or violence, arson as defined in Section 447a of this code, murder, assault with intent to commit murder, train wrecking, felonious assault with a deadly weapon, extortion, kidnapping, escape from a state prison by use of force or dangerous or deadly weapons, rape or fornication or sodomy or carnal abuse of a child under the age of 14 years, or any act punishable under Section 288 of this code, conspiracy to commit any one or more of the aforementioned felonies, who shall have been previously three times convicted, upon charges separately brought and tried, and who shall have served separate terms therefor in any state prison and/or federal penal institution, either in this State or elsewhere, of the crime of robbery, burglary, burglary with explosives, rape with force or violence, arson, murder, assault with intent to commit murder, grand theft, bribery of a public official, perjury, subornation of perjury, train wrecking, feloniously receiving stolen goods, felonious assault with a deadly weapon, extortion, kidnaping, mayhem, escape from a state prison, rape or fornication or sodomy or carnal abuse of a child under the age of 14 years, or any act punishable under Section 288 of this code, conspiracy to commit any one or more of the aforementioned felonies, shall be adjudged an habitual criminal and shall be punished by imprisonment in the state prison for life."

subd. (a), 3047.5.)[11] Thus, not only is the provision under attack here more severe than the sentences inflicted for several far more dangerous felonies, the recidivist provision of section 11501 is more severe than that provided for the third conviction of such felonies.

The Attorney General argues that the recidivist provision of section 11501 is not unusually severe when compared with similar sentences imposed for repeated violations of other provisions of the Health and Safety Code relating to drug abuse. (See *In re Lynch, supra,* 8 Cal.3d 410, 434-436.) The provisions precluding parole consideration for the mandatory minimum terms contained in the statutes to which the Attorney General refers, however, were all enacted in 1961 as part of the same legislation[12] (Stats. 1961, ch. 274, §§ 1-10, pp. 1301-1307), and thus appear to be a part of an overall legislative reaction to the increasing problems of drug abuse.[13] As noted above, the comparison between punishments imposed for more serious crimes with the punishment in question is based upon the assumption that although isolated excessive penalties may occasionally be enacted through " 'honest zeal' . . . generated in response to transitory public emotion," the vast majority of punishments may be deemed to have been enacted with due regard for constitutional restraints. *(In re Lynch, supra,* 8 Cal.3d 410, 426.) Similar penalties for related offenses enacted by the same legislation are subject to the same "zeal" as the punishment in question. Such penalties cannot, therefore, be taken as illustrative of the permissible degrees of severity under article I, section 6, of our Constitution. In addition, even if similar penalties for drug offenses could be used as

---

[11]The felonies listed in Penal Code section 644, subdivision (a), are identical to those listed in subdivision (b) of section 644, *supra* (fn. 10, *ante*).

[12]In addition to section 11501, the 1961 legislation provided mandatory minimum terms for possession of a narcotic other than marijuana (Health & Saf. Code, § 11500, now § 11350), possession for sale (§ 11500.5, which was newly enacted in 1961, now § 11351), solicitation of minors by a person over the age of 21 (§ 11502, now § 11353), solicitation of minors by a person under the age of 21 (§ 11502.1, newly enacted in 1961, now § 11354), cultivation and possession of marijuana (§ 11530, now § 11357), possession of marijuana for sale (§ 11530.5, newly enacted in 1961, now § 11359), sale of marijuana (§ 11531, now § 11360), and solicitation of a minor to violate the marijuana laws by a person 21 years of age or over (§ 11352, now § 11361).

The constitutional validity of these provisions is not now before us and we therefore express no opinion on that question.

[13]One commentator has gone so far as to suggest that this legislation was enacted in the light of hysteria rather than reason. (Belton, *Civil Commitment of Narcotics Addicts in California: A Case History of Statutory Construction,* 19 Hastings L.J. 603, 646.) However characterized, the 1961 Legislature was faced with strong pressure to increase penalties for violations of the drug laws. (See Burke, Factors Leading to California's New Narcotic Laws, Proceedings of the Institute on the Problem of Narcotic Addiction, California Department of Corrections (1962) p. 6.)

a standard against which to compare the penalty of section 11501, such a comparison does not negate the fact that the penalty is considerably more harsh than penalties imposed for far more serious crimes in California.

### 3. *Disproportionality: Other Jurisdictions*

The third analysis set forth in *In re Lynch, supra,* 8 Cal.3d 410, 427, further strengthens the conclusion that the provision precluding parole consideration for the 10-year minimum term of section 11501 is unusually severe. According to the Attorney General's return, although a number of states impose a minimum term of 10 years or more for conviction of the sale of heroin with a prior narcotics offense, only four states, Alaska, Arizona, Georgia and Nebraska, require a mandatory minimum term of imprisonment without possibility of parole for 10 or more years for such a conviction. In addition, Colorado imposes a mandatory minimum term of 10 years without possibility of parole for conviction of a first offense. It thus appears that the penalty imposed by section 11501 is more severe than that imposed by the vast majority of the states of the Union. This provides us with further indication that the penalty is excessive.

In addition, we note that the Advisory Council of Judges of the National Council on Crime and Delinquency, in their Model Sentencing Act, reject the concept of mandatory minimum terms of imprisonment.[14] (Model Sentencing Act, 9 Crime & Delinquency 339, 365, com. on § 13.) The American Bar Association Project on Minimum Standards for Criminal Justice also recommends against the legislative requirement that the court impose a minimum period of imprisonment which must be served before an offender becomes eligible for parole. (Standards Relating to Sentencing Alternatives and Procedures, Approved Draft (1968), § 3.2, subd. (a), p. 142.) The conclusions of these committees reinforce the views that lengthy mandatory minimum terms without possibility of parole are harsh and serve no legitimate penological purpose. The observations of the foregoing authorities coupled with the possible effect of section 11501 of punishing a drug dependent offender, partly because of his status as an addict, while depriving him for 10 years of hope of securing freedom through rehabilitation, convince us that the punishment imposed by section 11501 is so dis-

---

[14]The comment on section 13 of the Model Sentencing Act states: "The form of the sentence governs parole, and it is therefore appropriate to include, in a sentencing act, reference to the exercise of parole. As noted above (Comment on Section 1), for parole to be effective the board of parole must have, among other things, ample authority to release in its discretion. Minimum terms of parole eligibility infringe on this authority. Accordingly the Act does not provide for any minimum term (Sections 5, 7, 8 and 9). If the parole law or other statute (Penal Code) in a jurisdiction states minimum terms, such provisions should be repealed."

proportionate to the offense committed as to shock the conscience and offend fundamental notions of human dignity.

■ In summary, we have concluded that the provision of section 11501 precluding parole consideration for a minimum period of 10 years imposed upon an offender with a prior drug conviction, without regard to the existence of such possible mitigating circumstances as the addict status of the offender, the quantity of narcotics involved, the nature of the purchaser, or the purposes of the sale, is in violation of article I, section 6, of the California Constitution.

As pointed out above, the feature of section 11501 precluding parole consideration for the duration of the 10-year minimum term was separately added in 1961. Prior to that time, section 11501 provided for a term of 10 years to life for violation of its provisions by an offender previously convicted of a drug-related offense. (Stats. 1954, First Ex. Sess., ch. 12, § 1, p. 258.) Such a sentence allows for parole consideration within three years (Pen. Code, § 3049). The section, prior to the 1961 amendment, thus allowed for consideration of the rehabilitative progress made by the offender after a reasonable period of incarceration and did not, therefore, constitute a penalty so disproportionate to the offense as to be in violation of the mandate of article I, section 6, of our Constitution. The provisions of section 11501 precluding parole consideration of a repeat offender as enacted in 1961 may thus be severed from the remaining portions of the statute and without disturbing the 10 years to life penalty proscribed by the section.

## II.

Petitioner, through counsel, raises two additional issues which must be considered herein.

He first contends that his admission of the prior conviction was invalid under *Boykin* v. *Alabama,* 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709], and *In re Tahl,* 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]. *Boykin* and *Tahl* require that in the taking of a guilty plea it must appear from the face of the record that the accused was aware, or made aware, of his right to confrontation, to a jury trial, and against self-incrimination. Petitioner points out that under section 11501, as under other recidivist statutes, the admission of a prior conviction results in a substantial increase of the potential punishment. He argues that such an admission is tantamount to a guilty plea thereby requiring the court to admonish the accused of the consequences of the plea as well as his right to a jury trial upon the existence

and validity of the alleged prior conviction. (Cf. *In re Mosley,* 1 Cal.3d 913, 924-925 [83 Cal.Rptr. 809, 464 P.2d 473].)

In *In re Yurko* (Crim. 16368) *ante,* page 857 [112 Cal.Rptr. 513, 519 P.2d 561], we held, in the context of the habitual criminal statute (Pen. Code, § 644, *supra*), that before the defendant is allowed to admit the prior, *Boykin* and *Tahl* constitutionally require an admonition of the defendant's right to a jury trial upon the question of the validity of the charged prior conviction as well as his right to confront witnesses and his right against compulsory self-incrimination. We held further that, as a matter of judicial policy, the trial court should apprise the defendant of the consequences of such an admission. Although the opinion in *Yurko* deals with admissions of prior convictions under the habitual criminal statute, we can see no logical basis for distinguishing such admissions from an admission of a prior conviction under section 11501 and similar statutes. As pointed out above, under the existing legislation, the effect of the admission of a single prior drug-related offense under section 11501 and its successor, section 11352, is more severe than the admission of two prior felony convictions under the habitual criminal statute. Even absent the provision precluding parole consideration for the minimum term of section 11501, the effect of the admissions of a prior drug offense under section 11501 is to increase the minimum term from five to ten years.

We also held in *Yurko* (*ante,* at p. 866) that the rules set forth therein will be prospectively applied only to admission taken after the effective date of that opinion. Petitioner's admission, obviously having been made prior to that date, will thus not qualify for relief under *Yurko*. We note on this point that petitioner has suffered no prejudice from the lack of an admonition as to the consequences of his prior. The sole ground of error attributed by petitioner to his prior conviction is considered in part IV of this opinion and is rejected as a basis for relief.

### III.

Petitioner's third contention is that the trial court's instruction to the jury, placing the burden on defendant to prove by a preponderance of the evidence that he was entrapped, violates due process by eliminating the constitutional burden of the prosecution to prove beyond a reasonable doubt every element of the crime.

Petitioner's contention that he was entrapped as a matter of law was rejected on appeal. Habeas corpus will not serve as a second appeal. (*In re Waltreus,* 62 Cal.2d 218, 225 [42 Cal.Rptr. 9, 397 P.2d 1001].) As we have noted above, however, habeas corpus jurisdiction does extend

to test whether the defendant was deprived of a fundamental constitutional right. (*In re Masching, supra,* 41 Cal.2d 530, 532.) ˌSince petitioner asserts the deprivation of his fundamental right to require proof by the prosecution beyond a reasonable doubt of every element of the offense with which he is charged (*In re Winship,* 397 U.S. 358, 361-364 [25 L.Ed. 2d 368, 373-375, 90 S.Ct. 1068]), we may consider his claim in this proceeding. We conclude, however, that petitioner's contention is without substantive merit.

In *People* v. *Moran,* 1 Cal.3d 755, 760 [83 Cal.Rptr. 411, 463 P.2d 763], we held that the defendant's burden to prove entrapment was not subject to the requirement of Penal Code section 1096, requiring the prosecution to prove the elements of the offense beyond a reasonable doubt, on the ground that the defense of entrapment in California is not a defense based upon the defendant's innocence. Quoting from *People* v. *Benford,* 53 Cal.2d 1, 9 [345 P.2d 928], we described the defense as having been created "as a control on illegal police conduct 'out of regard for [the court's] own dignity, and in the exercise of its power and the performance of its duty to formulate and apply proper standards for judicial enforcement of the criminal law.' " (*People* v. *Moran, supra,* 1 Cal.3d 755, 760-761.) At the same time, we concluded that the question of entrapment was for the jury to determine[15] and approved (p. 761, fn. 4) an instruction to the jury that the defendant was not criminally liable "If the intent to commit the crime did not originate with the defendant and he was not carrying out his own criminal purpose, but the crime was suggested *by another person* for the purpose of entrapping and causing the arrest of the defendant . . . ."[16] (Italics in the original.)

Petitioner argues that under such instructions the test for entrapment actually applied by the California trial courts is the "origin of intent" test utilized by the federal courts. Under this test, the principal element of entrapment is the defendant's lack of a predisposition to commit the charged offense rather than the illegality of the police conduct. (*United States* v. *Russell* (1973) 411 U.S. 423, 433 [36 L.Ed.2d 366, 374, 93 S.Ct. 1637].) This same element is present in the instruction given in *Moran* and in the instant case. Petitioner then asserts that, since a defendant's predisposition to commit an offense relates to his guilt or innocence, such predisposition must be proved beyond a reasonable doubt by the prosecu-

---

[15]Petitioner does not contend, as was argued by the dissenting opinion in *People* v. *Moran, supra,* that the question of entrapment should be determined by the court based upon an assessment of the propriety of the police methods rather than by the jury.

[16]At petitioner's request, a similar instruction was given in the instant case.

tion. The defect in this argument is that the defendant's predisposition to commit the crime is immaterial to the issue of his guilt (as long as the requisite criminal intent is shown to exist at the time of the commission of the offense) and applies only to the collateral affirmative defense of entrapment.

As pointed out above, entrapment is recognized as a defense to criminal charges in order to discourage illegal police conduct. (*People* v. *Moran, supra,* 1 Cal.3d 755, 760-761.) The successful assertion of the defense does not establish that the defendant lacked the requisite criminal intent and was thus innocent of a criminal offense, but merely that he should not be punished for the crime he in fact committed because of improper police conduct. (*People* v. *Benford, supra,* 53 Cal.2d 1, 9.) The burden thus remains upon the prosecution to prove beyond a reasonable doubt all of the elements of the charged offense, including intent.

For example, where the crime charged is the sale of a narcotic, and the prosecution has established that the sale took place and that the defendant intended to sell the narcotic substance, it has established the defendant's criminal liability and has thereby met its burden of proof. Once this occurs, the burden shifts to the defendant to establish whatever defenses, including entrapment, he might possess. In proving entrapment, the defendant establishes that his criminal intent was created by the prosecution and not that he lacked the criminal intent necessary to support a conviction. The existence of the requisite intent is, therefore, first established by the prosecution and the burden of proof upon this element is not shifted to the defendant.

Even under the federal origin of intent rule, it would not appear that the defendant's predisposition to commit the offense is an element of the prosecution's case. In *United States* v. *Russell, supra,* 411 U.S. 423, 435 [36 L.Ed.2d 366, 375], the United States Supreme Court stated that the federal defense of entrapment is rooted "in the notion that Congress could not have intended criminal punishment *for a defendant who has committed all the elements of a proscribed offense,* who was induced to commit them by the government." (Italics added.) It is clear from this statement that the elements necessary to establish the prescribed offense are separate from any government encouragement of the offense. Thus, even under the federal rule, there would be no unconstitutional shift in the burden of proof by placing the burden upon the defendant to establish that the offense was induced by improper police action.

### IV.

In his pro. per. petition filed with this court prior to the appointment of counsel, petitioner additionally contends that his prior conviction is invalid

because he was not represented by counsel at sentencing on the prior conviction. Even if true, this allegation is not sufficient to warrant relief. It has been held that a conviction may be considered for prior conviction purposes even though the criminal proceedings were suspended without imposition of judgment in order to permit the defendant's commitment to the California Rehabilitation Center as a narcotics addict (*People* v. *Sanchez,* 2 Cal.App.3d 467, 478-479 [82 Cal.Rptr. 582]; *People* v. *McCuiston,* 246 Cal.App.2d 799, 808-811 [55 Cal.Rptr. 482]; *People* v. *Rodriguez,* 243 Cal.App.2d 522, 526-528 [52 Cal.Rptr. 643]), or in order to place the defendant on probation (*People* v. *Christman,* 41 Cal.App.2d 158, 160-161 [106 P.2d 32]; see also *People* v. *Banks,* 53 Cal.2d 370, 386-387 [1 Cal.Rptr. 669, 348 P.2d 102]). Thus, it is clear that the fact of imposition of sentence is immaterial to the question of the defendant's prior conviction. Whether improperly sentenced, or not sentenced at all, the fact remains that the defendant has suffered a valid prior conviction. Thus, any defects in the sentencing procedure, including the absence of counsel, will not prevent consideration of the defendant's prior conviction for purposes of a recidivist statute providing an increased punishment for one who has suffered a prior conviction.

The provision of Health and Safety Code section 11501 precluding parole consideration for petitioner for a minimum of 10 years is invalid under article I, section 6, of the California Constitution and is therefore set aside. The Adult Authority is directed to grant parole consideration to petitioner at such time as is otherwise appropriate under the laws of this state. Petitioner is not entitled to release, however, until such time as the Adult Authority duly determines that he is eligible for parole under the 10-year-to-life term validly imposed by section 11501. The order to show cause is, therefore, discharged and the writ of habeas corpus denied.

Wright, C. J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

**CLARK, J.**—I concur in denying the writ, but dissent from holding section 11501 of the Health and Safety Code authorizes cruel and unusual punishment in violation of article I, section 6 of the California Constitution.

The majority holds section 11501 unconstitutionally cruel on the ground the statute excludes an offender with a prior drug conviction from parole consideration for the minimum term of 10 years "without regard to the existence of such possible mitigating circumstances as the addict status of the offender, the quantity of narcotics involved, the nature of the purchaser, or the purposes of the sale." (*Ante,* p. 929.) I cannot accept the majority's conclusion for this reason: the sentencing judge possesses the

power—inherent as well as conferred—to strike prior convictions if the majority's mitigating circumstances lead him to believe the interest of justice would be furthered by not subjecting a defendant to the recidivist provisions of section 11501. (See *People* v. *Benn* (1972) 7 Cal.3d 530 [102 Cal.Rptr. 593, 498 P.2d 433]; *People* v. *Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993]; *People* v. *Burke* (1956) 47 Cal.2d 45, 49-53 [301 P.2d 241].)

In *People* v. *Burke, supra,* this court considered the foundations of the judicial power to strike prior convictions not only where the conviction has not been legally established but, also where the court concludes the interest of justice would not be furthered by subjecting the defendant to the increased punishment entailed by finding the conviction true. Reasoning that the power to dismiss the whole includes the power to strike a part, we held that the Legislature authorized courts to strike prior convictions when it provided in section 1385 of the Penal Code that: "The court may, either on its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." (*People* v. *Burke, supra,* 47 Cal.2d at pp. 50-51.)

The People had argued in *Burke* that the power to strike prior convictions, granted by section 1385, was withdrawn by section 11712 of the Health and Safety Code because the latter provided that if a prior conviction "is admitted by the defendant, he shall be imprisoned in the state prison." Rejecting that argument, we suggested the Legislature could not constitutionally divest the courts of their inherent power to strike prior convictions. "The statutes in question do validly—and in respect to constitutionally vested judicial power they neither purport to nor validly could do more than—prescribe the sentence which must be imposed upon the appropriate adjudication of guilt of the substantive crime and judicial determination of the factor which results in increased punishment. Such adjudication and judicial determination are inherently and essentially the province of the court . . . ." (*People* v. *Burke, supra,* 47 Cal.2d at p. 52; see *People* v. *Valenti* (1957) 49 Cal.2d 199, 206 [316 P.2d 633].)

In 1959 the Legislature sought to restrict the judicial power to strike prior convictions by adding section 11718 to the Health and Safety Code, making the exercise of that power contingent on a motion by the district attorney.[1] In *People* v. *Sidener* (1962) 58 Cal.2d 645 [25 Cal.Rptr. 697,

---

[1]"In any criminal proceeding for violation of any provision of this division no allegation of fact which, if admitted or found to be true, would change the penalty for the offense charged from what the penalty would be if such fact were not alleged and admitted or proved to be true may be dismissed by the court or

375 P.2d 641], this court rejected the argument that section 11718 violated article VI, section 1, and article III of the California Constitution, which vest the judicial power in the judiciary and proclaim the separation of powers. Any statements or implications in *People* v. *Burke* and *People* v. *Valenti* to the contrary were said to be unnecessary to the holdings in those cases and were disapproved. (*People* v. *Sidener, supra,* 58 Cal.2d at p. 647.) *Sidener* was overruled by *People* v. *Tenorio* (1970) 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993]. Having been declared invalid in *Tenorio* because it encroached upon the constitutional province of the judiciary and violated the doctrine of separation of powers (Cal. Const., art. III; art. VI, § 1), section 11718 was repealed when the Uniform Controlled Substances Act was added to the Health and Safety Code in 1972. (Stats. 1972, ch. 1407, § 2, p. 2987.)

Since the sentencing court clearly has power to strike prior convictions alleged against a defendant convicted of violating section 11501—if it finds failure to do so would result in the imposition of cruel punishment in the circumstances of a particular case—the real question is whether the trial court here abused its discretion by denying petitioner's motion to strike his prior conviction. The majority would find an abuse of discretion of constitutional significance in refusal to strike prior convictions where the recidivism is "attributable solely to a psychological and/or physiological compulsion arising from an addiction to contraband." (*Ante,* p. 922.)

The record in this case, like the record in *Powell* v. *Texas* (1968) 392 U.S. 514 [20 L.Ed.2d 1254, 88 S.Ct. 2145], is "utterly inadequate to permit the sort of informed and responsible adjudication which alone can support the announcement of an important and wide-ranging new constitutional principle." (*Powell* v. *Texas, supra,* 392 U.S. at p. 521 [20 L.Ed.2d at p. 1261], plurality opinion.)[2] The trial court here did not find, nor is

---

stricken from the accusatory pleading except upon motion of the district attorney." (Health & Saf. Code, § 11718; added Stats. 1959, ch. 1772, p. 4256, § 1; repealed Stats. 1972, ch. 1407, § 2, p. 2987.)

[2]In *Powell* v. *Texas,* the trial court expressly found the defendant was a chronic alcoholic whose public drunkenness was the product, not of his own volition, but of a compulsion symptomatic of the disease of chronic alcoholism. (392 U.S. at pp. 521, 557 [20 L.Ed.2d at pp. 1261, 1281].) Relying on these "findings" the dissenters in *Powell* declared punishment of a chronic alcoholic for public drunkenness unconstitutionally cruel and unusual on the ground "a person may not be punished if the condition essential to constitute the defined crime is part of the pattern of his disease and is occasioned by a compulsion symptomatic of the disease." (392 U.S. at p. 569 [20 L.Ed.2d at p. 1288]; Fortas, J., dissenting.) Rejecting the trial court's "findings," Justice Marshall held one could not conclude "on the state of this record or on the current state of medical knowledge, that chronic alcoholics in general and Leroy Powell in particular, suffer from such an irresistible compulsion

there any evidence in the record to support a finding, that petitioner's recidivism was "attributable solely to a psychological and/or physiological compulsion arising from" addiction. Indeed, the entire thrust of petitioner's entrapment defense was that he furnished heroin to Holmes, the police agent, solely because of his sympathy for Holmes' withdrawal sufferings.

Just because petitioner was heroin-dependent to an uncertain extent, the majority assumes he was "compelled" to furnish heroin to Holmes in order to obtain some for himself. But drug dependence actually forms a continuum, "from lesser to greater, from minimum to compulsive." "[I]t is important to discard the undimensional concept of individual loss of self-control which has long dominated scientific and lay concepts of 'addiction.' Most people who use psychoactive drugs do not succumb entirely to the pharmacologic properties of the drugs. [The nature of the drug, the method, dose and frequency of administration, the personality of the user and the nature of the environment] interrelate in distinctly different fashions with different individuals under different circumstances." (Drug Use in America: Problem in Perspective, Second Report of the National Commission on Marijuana and Drug Abuse, GPO (1973) pp. 135, 138-139.) Since the formulation of social policy concerning drug dependence must reflect its complexity and relativity (id. at p. 139), it is instructive to examine petitioner's explanation of his conduct, discounting its self-serving character.

Although he first started using heroin in 1947, petitioner "stayed clean" from 1962 until the year before his arrest in 1971. Even after he began using heroin again he "never really got too far strung out," i.e., addicted, because he had "learned to exercise a little control" over the years. When Holmes approached him to obtain heroin petitioner was engaged in "kicking" his dependence. Far from having lost all control over his conduct, petitioner was capable of voluntarily undergoing withdrawal simply because his wife was "on his back" about his dependence "causing trouble with our sex relations."

Since he knew his own withdrawal symptoms—"similar to having the flu"—would soon subside, petitioner repeatedly refused to purchase heroin

---

to drink and to get drunk in public that they are utterly unable to control their performance of either or both of these acts and thus cannot be deterred at all from public intoxication." (392 U.S. at p. 535 [20 L.Ed.2d at p. 1269], plurality opinion.) Although he suggested chronic alcoholics who were homeless or so intoxicated as to have lost control of their movements might be unable to avoid being drunk in public, Justice White concurred in affirming the conviction on the ground "nothing in the record indicates that [Powell] could not have done his drinking in private or that he was so inebriated at the time that he had lost control of his movements and wandered into the public street." (392 U.S. at p. 553 [20 L.Ed.2d at p. 1279]; White, J., concurring.)

for Holmes even though Holmes offered to give him "a bag to help me kick my habit." It was sympathy for *Holmes'* suffering from withdrawal, not his *own* dependence, that finally made petitioner agree to serve as Holmes' purchasing agent on five occasions, despite initially refusing to do so each time. Petitioner's testimony revealed it was not a combination of drug dependence and economic necessity that prompted him to furnish heroin to Holmes. In fact, on one occasion petitioner had just cashed his unemployment check and grandly offered to pay the bill himself. Purchasing heroin for another in return for some of it was not part of the pattern of petitioner's heroin dependence. Indeed, petitioner claimed he had never engaged in such conduct before.

The foregoing summary of petitioner's testimony clearly establishes that the trial court did not abuse its discretion by refusing to strike petitioner's prior conviction. The record reveals that petitioner has not been punished cruelly, but the record is inadequate to support any broader conclusion. Since petitioner's drug dependence did not compel him to furnish heroin to Holmes, this case simply fails to present the question whether it is unconstitutionally cruel to apply the recidivist provisions of section 11501 to a defendant whose recidivism was "attributable solely to a psychological and/or physiological compulsion arising from" drug dependence.

In holding the recidivist provisions of section 11501 unconstitutional on the ground they are "considerably more harsh than penalties imposed for far more serious crimes in California" (*ante,* pp. 925-928), the majority invades the province of the Legislature. The punishment prescribed for a crime manifests a legislative judgment as to the relative seriousness of the offense. The Legislature has impliedly rejected the majority's view that crimes of violence "clearly present more serious violations of the penal laws" than petitioner's crime. (*Ante,* p. 926.) The Legislature's judgment is shared by, among others, former Governor Rockefeller of New York. In calling upon the New York Legislature to enact mandatory life sentences without possibility of parole for drug dealers, Governor Rockefeller said "The hard-drug pusher is a cold and cynical destroyer of lives as much as any killer." (N.Y. Times (11 Jan. 1973) p. 24, col. 4.) Since reasonable men differ as to whether the punishment here is proportionate to the crime we must defer to the Legislature, for it has the "broadest discretion possible . . . in specifying punishment for crime." (*In re Lynch* (1972) 8 Cal.3d 410, 414 [105 Cal.Rptr. 217, 503 P.2d 921]; *People* v. *Anderson* (1972) 6 Cal.3d 628, 640 [100 Cal.Rptr. 152, 493 P.2d 880].)

As the majority reveals, the recidivist provisions of section 11501 are not unusually severe when compared with similar sentences imposed for repeated violations of other provisions of the Health and Safety Code relat-

ing to drug abuse. (See *ante,* p. 927; fn. 12.) Noting the various provisions of the Health and Safety Code precluding parole consideration for the mandatory minimum term were all enacted in 1961 as part of an "overall legislative reaction to the increasing problems of drug abuse," the majority dismisses the legislation as the product of " 'honest zeal' . . . generated in response to transitory public emotion," or even "hysteria." (*Ante,* p. 927, fn. 13.) This court should not dismiss the legislative expression of the People's will so lightly. The penalties for repeated offenses involving a narcotic other than marijuana adopted in 1961 were reenacted without change in 1972 with the passage of the Uniform Controlled Substances Act (Stats. 1972, ch. 1407, § 3), after a decade in which they had been attacked in the courts as cruel and unusual (see, e.g., *People* v. *Clark* (1970) 3 Cal.3d 97, 99 [89 Cal.Rptr. 253, 473 P.2d 997]) and periodically reconsidered by the Legislature (see, e.g., 22 Assem. Interim Com. Rep. No. 9, Narcotics Control (Jan. 1967) pp. 16-17, 23, 2 Appendix to Assem. J. (1967 Reg. Sess.).)

Since capital punishment was authorized by statute in 41 states when held unusual in *People* v. *Anderson* (1972) 6 Cal.3d 628, 648 [100 Cal. Rptr. 152, 493 P.2d 880], the fact that the penalty imposed by section 11501 is "more severe than that imposed by the vast majority of the states of the Union (*ante,* p. 928) is surely of negligible constitutional significance. Admittedly, the Advisory Council of Judges of the National Council on Crime and Delinquency and the American Bar Association Project on Minimum Standards for Criminal Justice recommend against mandatory minimum terms of imprisonment (*ante,* pp. 928, 929), but their recommendations were made to state *legislatures* on policy grounds—not to state *courts* on constitutional grounds. (Model Sentencing Act, 9 Crime & Delinquency 339, com. on § 13; Standards Relating to Sentencing Alternatives and Procedures, Approved Draft, com. on § 3.2.)

The provision of Health and Safety Code section 11501 precluding parole consideration for petitioner for a minimum of 10 years is neither cruel nor unusual.

McComb, J., concurred.