[Crim. No. 10507. Third Dist. Sept. 5, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTOPHER ALLEN GAYTHER, Defendant and Appellant.

80

**COUNSEL**

Quin Denvir, State Public Defender, Stanley Kubochi and Mark E. Cutler, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, James T. McNally and Diana Beth Constantino, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

EVANS, J.—Following his conviction by jury of two counts of oral copulation (Pen. Code, § 288a)[1] and rape (§ 261, subd. 3), the court sentenced defendant to state prison for the lower term of three years for the rape and stayed imposition of sentence on the two counts of oral copulation, the stay to become permanent upon completion of the sentence for rape.

Defendant challenges the sufficiency of the evidence to support his convictions and contends that a mandatory prison term prescribed for a conviction of rape by threat is cruel and unusual punishment and a violation of the guarantee of equal protection of the law.

The following rather extensive summary is required by defendant's challenge to the sufficiency of the evidence.

About noon on May 12, 1979, Kimberly H. and her friend Lori B. intended to travel to the Latrobe area on the Consumnes River to sunbathe. Uncertain of the way they stopped at a gas station and were told to take highway 16. While they were stopped at a light on Watt Avenue in Sacramento, a man on a motorcycle, later identified by both Lori and Kimberly as defendant, pulled up on the driver's side of the car and spoke to the girls. He asked where they were going, and they responded they were going to Latrobe and asked for directions to highway 16. Defendant said they were looking for the wrong highway and asked if they wanted to follow him; they agreed. Kimberly accepted defendant's invitation to ride on the back of his motorcycle. The trio stopped at a gas station to get gas for Lori's car, but the pumps were closed; they then stopped at a Raley's market where Lori purchased two six-packs of beer. Kimberly and defendant took two cans on the motorcycle and consumed them on the way. They finally stopped at a bridge on the Consumnes River. Lori, who had been there before, led them

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

about three-fourths of a mile along the river to an open sandy beach. Kimberly, wearing a two-piece bathing suit underneath her shirt and jeans, removed her outer clothing. Lori was wearing shorts, a blouse, and sandals, but she did not have her bathing suit top on. She decided to put the suit top on and told defendant to turn around; he complied. Defendant removed his shoes, socks, and shirt.

Although one or two people had been observed before reaching the beach, there were no other people at the beach site. The three drank beer, talked, and occasionally entered the water to cool off. Kimberly drank two beers, Lori had one or two, and defendant drank a six-pack. Approximately two hours later, they started to leave and put on their outer clothing.

While Lori was some distance away, defendant touched Kimberly on the breast and kissed her. Kimberly pushed him away and "asked him what he thought he was doing." Defendant tried again, and Kimberly pushed him away again. Lori saw the kiss and observed Kimberly mouthing the words, "Let's go now."

The three then started back on the path toward the bridge; Kimberly was leading, defendant in the middle, and Lori was at the rear. The dirt path was narrow with brush on both sides. As they left the beach area, defendant reached around Kimberly with both hands and grabbed her breast. She turned around and again asked him what he was doing. He did not reply. As they resumed walking, defendant again touched Kimberly's breast and again she pushed him away. At one point defendant reached between Kimberly's legs from behind and grabbed her "entire genital area." She again pushed him away and tried to hurry on.

About five minutes after leaving the beach, defendant stepped in front of both women and ordered them to take off their tops; when they did not comply, he repeated the order and again they refused and said they thought defendant was their friend. After two or three additional commands, defendant started counting in a very demanding fashion; and when they again questioned his actions, defendant exhibited a buck knife, with a four-inch blade, and held it about six inches to a foot from Kimberly's neck. The girls, afraid for their lives, removed their tops as ordered and then complied with defendant's command to remove the rest of their clothing.

Still holding the knife, defendant forced Kimberly to remove his boots; while on her knees unlacing his knee-high boots, defendant pushed forcefully on her head. At defendant's direction, Lori sat on the path. Standing where he blocked access to the path to the bridge, defendant removed the rest of his clothes and then pulled Kimberly up to his waist and forced her to orally copulate him. When finished, he pushed her away, ordered her to lay on the path, and orally copulated her. Later, out of fear, Kimberly complied with defendant's direction for mutual oral copulation. During this act, Kimberly made eye contact with Lori and mouthed the words, "Get the knife." Lori made a negative response, fearing that she couldn't get to the knife.

Defendant then pushed Kimberly off and told Lori it was her turn. Lori at first refused, but when he ordered, she complied with his demand and commenced mutual oral copulation. At that time Kimberly attempted to put on her bathing suit bottom. Defendant grabbed the clothing and ordered her to remove it. Defendant shoved Lori away and forced Kimberly down on the path on her back and accomplished an act of sexual intercourse. When he finished, everyone started to dress and return to the bridge. Kimberly began a rambling conversation in an effort to insure that she and Lori would be safe to go. Defendant was singing and talking, and at one point said, "Kim, Lori, are you okay? I feel like I just raped you." After walking for about 20 minutes, they began to see people along the beach.

Lori and Kimberly left the path to get a drink of water, and defendant went on to check his motorcycle. Kimberly approached a man and woman, told them what had happened, and asked for help getting to the road safely. They walked with the girls to their car where Kimberly noted the license number of defendant's motorcycle.

David Howland, the man who had escorted the women, testified that one of the women said she had just been raped and that they wanted assistance while returning to their car. They also identified defendant as the perpetrator and appeared to be frightened and wanted to leave.

Lori and Kimberly went to the Raley's market which was the first public place available. While they were at the checkstand, defendant walked in the store. The girls hid behind the checkstand and told the checker they had been raped by defendant; she took them to the manager's cage where Lori and Kimberly sat on the floor while the police were called. The checker at Raley's, Debbie Swearingen, testified that

both of them seemed very upset, and that Kimberly was so emotionally disturbed she could not talk; Lori appeared to be more in control.

Corporal Doan of the El Dorado County Sheriff's Department testified that upon his arrival at Raley's, Kimberly was shaky, nervous, and crying; Lori was also very nervous and shaky. At the sheriff's office, each of them identified a photograph of defendant and named him as the perpetrator.

As Deputy Ellis was traveling toward Raley's on highway 50, he observed defendant driving a three-wheel motorcycle with a license number matching that given in a radio broadcast. Ellis activated his red lights and siren, approached within 20 feet of the rear of the motorcycle, and observed the driver look in the side mirrors. The motorcycle increased speed from 70 to 90 miles per hour, and Ellis continued to maintain his position 20 feet behind the cycle. After traveling approximately three miles, the motorcycle malfunctioned, spraying water and oil over Ellis' patrol car. The motorcycle then pulled over and stopped. Ellis arrested defendant and took from his belt a buck knife which Kimberly and Lori later identified as the knife used by defendant during the assaults.

Defendant admitted the sexual acts with the two women but testified that they were consensual. He also denied that he had threatened either woman with a knife. He also testified that he had not heard the siren, and that he pulled over and stopped shortly after he saw the flashing red light.

## I

■ The basic principles which govern judicial review of a criminal conviction challenged as lacking evidentiary support require the court to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial, reasonable, and credible evidence, of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738]; *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People* v. *Reyes* (1974) 12 Cal.3d 486, 496 [116 Cal.Rptr. 217, 526 P.2d 225]; *People* v. *Vann* (1974) 12 Cal.3d 220, 225 [115 Cal.Rptr. 352, 524 P.2d 824].) ■ This we have done and conclude the challenge to the sufficiency of the evidence is a sham, bordering on the frivolous. How-

ever, defendant asks that we concoct a refinement of the substantial evidence test which would require a limited reweighing of the evidence to determine if the jury could have reasonably and fairly resolved conflicts in the evidence or draw inferences in favor of the judgment. We decline the request. To do as suggested would pervert the entire review process of criminal convictions. Moreover, in this instance the evidence presented by the whole record did not require inferences to be drawn to establish defendant's guilt. The issue of defendant's guilt rested squarely on the jury's determination of the credibility of the witnesses. The testimony of the defendant and of the prosecuting witnesses regarding the events of the day was virtually identical, except for the crucial question of consent. ■ Obviously the jury believed the testimony of the two victims and for us to reject the testimony of witnesses believed by a trial court, there must exist either a physical impossibility that their testimony is true or that its falsity is apparent without resorting to inferences or deductions. (*People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267].) There was nothing inherently improbable about the testimony of the two women.

## II

Defendant contends that the mandatory denial of probation under former Penal Code section 264.2[2] to persons convicted of rape accomplished by threat of great and immediate bodily harm (Pen. Code, § 261, subd. 3) constitutes cruel and unusual punishment.

■ The power to define crimes and fix punishments is vested exclusively in the legislative branch subject only to the constitutional prohibition against cruel or unusual punishment. (*In re Lynch* (1972) 8 Cal.3d 410, 414-415 [105 Cal.Rptr. 217, 503 P.2d 921].) Subject to this limitation, the Legislature has the power to preclude probation in certain cases. (*People* v. *Tanner* (1979) 24 Cal.3d 514, 519, fn. 3 [156 Cal.Rptr. 450, 596 P.2d 328]; *People* v. *Westoby* (1976) 63 Cal.App.3d 790, 798 [134 Cal.Rptr. 97].)

---

[2]Former Penal Code section 264.2 was repealed in 1979 (Stats. 1979, ch. 944, § 5) in conjunction with the enactment of similar provisions which expand the list of sexual offenses which preclude probation (Pen. Code, § 1203.065, subd. (a)).

Former Penal Code section 264.2 provided: "Probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, any person convicted of violating subdivision (2) or (3) of Section 261, or Section 264.1. [¶] This section does not prohibit the adjournment of criminal proceedings pursuant to Division 3 (commencing with Section 3000) or Division 6 (commencing with Section 6000) of the Welfare and Institutions Code."

■ Cruel and unusual punishment is defined as that which is so disproportionate to the crime for which it is imposed that it shocks the conscience and offends fundamental notions of human dignity. (Cal. Const., art. I, § 17; *In re Lynch, supra*, 8 Cal.3d at p. 424.) ■ The *Lynch* court articulated three techniques which may be used as aids in administering the rule: (1) the first requires an examination of the offense and the offender with particular regard to the degree of danger both present to society; (2) the second involves a comparison of the challenged penalty with punishments prescribed in the same jurisdiction for different offenses which, by the same test, are deemed more serious, and (3) the third technique involves a comparison of the punishment imposed with the punishments prescribed for the same offense in other jurisdictions which have an identical or similar constitutional provision. (*Id.*, at pp. 425-427.)

Applying the first test, it is indisputable that rape is a serious offense, and the victims generally experience substantial psychological and emotional distress. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 582 [146 Cal.Rptr. 859, 580 P.2d 274].) "The essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape. Any sexual penetration, however slight, is sufficient to complete the crime." (Pen. Code, § 263.) Moreover, rape by threat of great bodily injury involves a potential for violence.

■ Defendant does not dispute the seriousness of the offense of rape in the abstract; rather he attempts to minimize the gravity of the crime by emphasizing that the women allowed him to accompany them to a secluded area and that he did not inflict physical injuries upon them. His assertions ignore his threats to the victims with a knife by which he secured their submission to oral copulation and an act of rape.

Regarding the nature of the offender, we recognize that the trial court found mitigating factors personal to defendant. Defendant's argument, that the statute constitutes cruel and unusual punishment because it prohibits probation without regard to mitigating factors before denying probation, has been previously rejected in *People* v. *Solorzano* (1978) 84 Cal.App.3d 413, 415-416 [148 Cal.Rptr. 696]. There the court, in upholding section 1203.07 which precludes probation for any person convicted of possession for sale or sale of one-half ounce or more of a substance containing heroin, observed that mitigating factors play a very important part in setting the actual punishment imposed. In this

instance mitigating factors were considered at the time of imposing the sentence of the lower prison term of three years.

Defendant's reliance on *In re Foss* (1974) 10 Cal.3d 910 [112 Cal.Rptr. 649, 519 P.2d 1073], and *In re Grant* (1976) 18 Cal.3d 1 [132 Cal.Rptr. 430, 553 P.2d 590], is misplaced. Both cases involved lengthy (10 or 15 years) mandatory minimum sentences for recidivist offenders.

As this court observed in *Smith* v. *Municipal Court* (1978) 78 Cal. App.3d 592, 598 [144 Cal.Rptr. 504]: "[F]or purposes of the first *Lynch* technique, a mandatory minimum sentence is to be considered disproportionate *on its face* (i.e., without regard to the circumstances of the particular offender) when (1) the statute penalizes 'repeated' conduct of widely varying gravity without regard for regularly recurring mitigating factors, *and* (2) parole is precluded for a 'substantial' length of time in excess of that reasonably calculated to allow for consideration of rehabilitative progress or to fulfill other legitimate penological objectives." (Italics in original; see also *In re Grant, supra*, 18 Cal.3d at pp. 12-13.)

The defendant was not a repeat offender; the minimum prison term, exclusive of good conduct credits, imposed is three years. It is substantially less than those invalidated by *Foss* and *Grant*. Moreover, the stated purpose of the determinate sentencing law, that imprisonment is imposed for purposes of punishment, erodes the previous emphasis placed upon the rehabilitative process, as noted in *Smith*, 78 Cal.App. 3d at pages 598-599.

Applying the second *Lynch* test, we disagree with defendant's assertion that mandatory denial of probation for rape is considerably more severe than the penalty for other serious felonies. Defendant's argument that one convicted of murder is theoretically eligible for probation is illusory. For example, use of a firearm or infliction of great bodily injury during the commission of a murder (or other serious felonies such as robbery and kidnapping) precludes probation. (§§ 1203.06, 1203.075.) Additionally, murder may be committed under circumstances involving less than intentional conduct (i.e., willful and reckless conduct); rape, in contrast, invariably includes an intentional act of outrage against another. Moreover, leniency as to one charge does not transform a reasonable punishment into one that is cruel and unusual. (*Bosco* v. *Justice Court* (1978) 77 Cal.App.3d 179, 187 [143 Cal.Rptr. 468].)

Under California law, probation is precluded primarily for those who commit violent crimes, serious drug offenses, and recidivist serious offenders. (*People* v. *Madden* (1979) 98 Cal.App.3d 249, 254-255 [159 Cal.Rptr. 381]; see also §§ 1203.06, 1203.065, 1203.07, 1203.075, 1203.08, 1203.09, 12311.) It does not appear that rape has been singled out for disproportionate punishment.

Moreover, were we to accept defendant's premise that the statutory ban on probation for rape accomplished by threat is suspect under the second *Lynch* test, that determination is not determinative. ■ The *Lynch* test is not to be mechanically applied; if the latter two *Lynch* techniques indicate disproportionality, the first test is nonetheless dispositive. (*Smith* v. *Municipal Court, supra*, 78 Cal.App.3d at p. 599; *People* v. *Wingo* (1975) 14 Cal.3d 169, 180 [121 Cal.Rptr. 97, 534 P.2d 1001]; *Bosco* v. *Justice Court, supra*, 77 Cal.App.3d at p. 189.)

Finally, defendant concedes that by comparison to penalties of sister states for rape, the statutory ban on probation is not suspect.

■ As the *Lynch* court stated, "Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." (*In re Lynch, supra*, 8 Cal.3d at pp. 423-424.)

The enactment of section 264.2 and section 1203.065 by the Legislature did not transgress that limitation. The statutory ban on probation for a conviction of rape by threat neither on its face nor as applied in this case constitutes cruel or unusual punishment. (See *People* v. *Williams* (1980) 101 Cal.App.3d 711, 720-724 [161 Cal.Rptr. 830].)

## III

■ Defendant relies on *People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375], in support of the contention that section 264.2 denies him equal protection of the law because it singles out a

class of persons—convicted rapists—and subjects them to mandatory prison sentences with no opportunity for the sentencing court to consider mitigating factors.

In *Smith* v. *Municipal Court, supra*, 78 Cal.App.3d 592, the court rejected the identical contention that the equal protection of the law was denied because the statute singled out a group of violators and denied them the opportunity, available to virtually all other convicted persons, to be considered for probation. The *Smith* court observed at page 601: "[I]t is one thing to hold, as did *Olivas*, that persons convicted of the *same crime* cannot be treated differently. It is quite another to hold that persons convicted of *different crimes* must be treated equally. The latter are not similarly situated for equal protection purposes. Recognition of plaintiffs' attempt to place themselves in the category of '...all persons convicted of crimes...' would require that every difference in punishment among all criminal statutes be strictly scrutinized." (Italics in original.)

The court concluded that *Olivas* was not intended to apply to sentencing inequalities between and among different offenses. For purposes of an equal protection analysis, defendant has failed to establish a classification which treats a similarly situated group in disparate ways. The statute precludes *all* persons convicted of rape by threat (Pen. Code, § 261, subd. 3) from consideration for probation. It does not constitute cruel and unusual punishment (Cal. Const. art. I, § 17), nor does it violate equal protection granted by the Fourteenth Amendment to the United States Constitution. (See *People* v. *Tanner, supra*, 24 Cal.3d 514.)

The judgment is affirmed.

Regan, Acting P. J., concurred.

**REYNOSO, J.**—I concur in the result. I believe, however, that the Constitution precepts of equal protection of the law and cruel and unusual punishment are viable vehicles for review of disparate treatment even when the punishment is for different crimes. Thirty years in prison for possession of one ounce of marijuana versus six months for selling of heroin, as a clear example, would violate equal protection or would be cruel and unusual. Generally, defendant is correct that it makes little sense to permit probation for a murderer but not for a rapist. Senselessness, however, is not synonymous with unconstitutionality.

The inexact task of assessing punishment lies with the Legislature. Only when disparaties are great should the Constitution be viewed as placing a limit on the Legislature. I am not convinced that such a disparity exists in the case at bench. Three years in prison (less good time/work time) for conviction of the inhumane and cruel crime of rape neither shocks the conscience (in relation to other crimes) nor presents such a disparity of treatment as to violate equal protection.

A petition for a rehearing was denied October 3, 1980, and appellant's petition for a hearing by the Supreme Court was denied November 12, 1980.