[No. B011757. Second Dist., Div. One. Mar. 25, 1987.]

THE PEOPLE, Plaintiff and Appellant, v.
NORMA JEAN ALMODOVAR, Defendant and Respondent.

COUNSEL

Ira Reiner, District Attorney, Donald J. Kaplan, Arnold T. Guminski and Dirk L. Hudson, Deputy District Attorneys, for Plaintiff and Appellant.

Lawrence Teeter for Defendant and Respondent.

OPINION

HANSON (Thaxton), J.—

INTRODUCTION

The People appeal from an order suspending the proceedings and granting defendant probation.[1]

STATEMENT OF FACTS

Defendant formerly worked as a civilian traffic officer for the Los Angeles Police Department. During her employment, she met Patricia Isgro (Isgro), another traffic officer. The two saw each other occasionally and had brief conversations at work in April 1979; defendant was then transferred and there was no further contact between the two.

In July 1983, defendant telephoned Isgro at work. Isgro was surprised to hear from defendant and also curious, having heard defendant had been arrested recently. They arranged to meet at a restaurant, where defendant told Isgro she had left the police department and was now a prostitute. Defendant was writing a book, "From Cop to Call Girl," describing her exploits with the police department and further escapades as a prostitute. Defendant offered Isgro a job as her secretary, knowing Isgro previously had worked as a secretary for the police department; Isgro laughed at the offer. Defendant also told Isgro her life had greatly improved, and she was now earning several thousand dollars a month.

Isgro left the meeting with no plans to see defendant again; defendant was a known prostitute, and Isgro did not wish to jeopardize her position with the police department by associating with defendant. Nevertheless, defendant continued to telephone Isgro at the police station; Isgro told station personnel she did not want to take the calls and told them to tell defendant she was out of the station. Defendant left messages for Isgro, who did not respond to them.

---

[1] The order is appealable pursuant to Penal Code section 1238, subdivision (a)(5). (*People v. Hames* (1985) 172 Cal.App.3d 1238, 1242 [218 Cal.Rptr. 701]; *People v. Gaines* (1980) 112 Cal.App.3d 508 [169 Cal.Rptr. 381].)

Defendant finally got through to Isgro on September 7, 1983. Defendant indicated she had a friend who would pay Isgro to sleep with him and defendant desired to arrange this. Isgro laughed and hung up the telephone. Upon further thought, Isgro informed a superior of the situation; he arranged an interview with Detectives Vanderpool and Clapp. Isgro agreed to assist the detectives in an investigation.

Isgro telephoned defendant from the police station several times; these calls were monitored and tape recorded by the detectives. Isgro also made a visit to defendant's apartment, wearing a body wire; again, her conversation with defendant was taped. During the course of their conversations, defendant arranged Isgro's "date" with defendant's friend.

Defendant's friend, Harry, owned a service station and serviced defendant's automobile for free. Harry liked older women who were tall and big. Defendant was young, small and short, whereas Isgro was 50 years old, 6 feet tall, 200 pounds and buxom—exactly what Harry liked. Isgro would keep all the money Harry paid her. Defendant indicated prostitution would only be a part-time job for Isgro—Isgro acknowledging not too many customers would be interested in a woman of her description—and Isgro could still work as defendant's secretary.

Defendant explained Harry and his friend Bill got together on Saturday afternoons and "played" with two prostitutes at Bill's office; Isgro was to be Harry's date on these occasions while defendant or another woman would be with Bill. Bill was influential in the restaurant business and could provide many contacts and introductions to defendant, a budding authoress.

During the course of the conversations, defendant provided descriptions of her work as a call girl, told Isgro about other people in the business and some of their well-known clients. Defendant also told Isgro more about her book, especially the chapters dealing with her relationship with the police department and sexual escapades with other officers. At one point, defendant sought reassurance Isgro was not setting her up for an arrest; Isgro was able to reassure her.

Defendant finally arranged for Isgro to contact Harry. Isgro telephoned Harry and the two arranged to meet at a restaurant the following day. The meeting never took place, however; defendant telephoned Isgro to let her know Harry's daughter was sick and Harry would be unable to keep the date.

PROCEDURAL BACKGROUND

Defendant was convicted of pandering in violation of Penal Code section

266i.[2] Following her conviction, she was committed to the custody of the Department of Corrections for a diagnostic evaluation pursuant to section 1203.03; she served 72 days in custody.

The punishment for pandering is a state prison term of three, four or six years. (§ 266i.) Section 1203.065, subdivision (a), prohibits probation for a convicted panderer.[3] Defendant moved to have the latter statute declared unconstitutional. The trial court found the section unconstitutional as applied; it ordered the proceedings suspended and defendant placed on probation for three years.

CONTENTIONS

I

The People contend the trial court erred in granting defendant probation rather than sentencing her to state prison as required by section 1203.065.

II

The People further contend, in the event the order is reversed, defendant should be resentenced according to law.

DISCUSSION

I

 The People contend the trial court erred in granting defendant probation rather than sentencing her to state prison as required by section 1203.065. We agree.

In granting probation to defendant, rather than the statutorily required prison term, the trial court stated: "I think in this case it would be unconstitutional to send this lady at the present stage of her life, to say that she must do a minimum of three years state prison. [¶] I will note that robbers are eligible to two years and certainly she in no way is—even robbers are even given probation; and she in no way is anyplace on the level with robbers.

---

[2]All further section references are to the Penal Code.

[3]Section 1203.065, subdivision (a), provides: "Notwithstanding any other provision of law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, any person convicted of violating subdivision (2) of Section 261, or Section 264.1, or Section 266h, or Section 266i, or Section 266j, or 289, or of committing sodomy or oral copulation in violation of Section 286 or 288a by force, violence, duress, menace or threat of great bodily harm or subdivision 9(c) of Section 311.4."

[¶] I think what happened is obviously the legislature [*sic*] intended to round up all the pimps and the panderers and they had the idea of — were thinking about somebody on Hollywood Boulevard with a string of girls. [¶] So they made a statute that tried to fit everybody in. As I indicated last year, it is a procrustean statute that makes up for the shortcomings by being draconian in nature. In this case the punishment is clearly out of proportion to the actions of defendant." The foregoing comments indicate the court found Penal Code section 1203.065, subdivision (a), prohibiting probation for persons convicted of pandering, unconstitutional *as applied* to defendant rather than on its face. The People assert the statute is constitutional both on its face and as applied.

In addressing the issue of cruel or unusual punishment, it must be borne in mind "in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and . . . such questions are in the first instance for the judgment of the Legislature alone." (*In re Lynch* (1972) 8 Cal.3d 410, 414 [105 Cal.Rptr. 217, 503 P.2d 921].) The Legislature is limited, however, by article I, section 17, of the California Constitution, which proscribes the infliction of cruel or unusual punishment; the courts must make the ultimate determination whether a specific punishment violates this constitutional proscription. (*Ibid.*)

It is a defendant's burden to prove the punishment prescribed for his or her offense is unconstitutional. (*People* v. *Wingo* (1975) 14 Cal.3d 169, 174, 183 [121 Cal.Rptr. 97, 534 P.2d 1001].) Statutes prescribing punishments, as with other statutes, must be upheld unless they are clearly and unmistakably shown to be unconstitutional. (*In re Lynch, supra,* 8 Cal.3d at pp. 414-415.)

*Lynch* holds a punishment is cruel or unusual if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (8 Cal.3d at p. 424.) "Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' . . . ." (*Id.,* at pp. 423-424.)

The *Lynch* court fashioned a three-pronged test to aid in determining whether a particular punishment is unconstitutionally disproportionate to the offense for which it is imposed; the test is not determinative, but is a tool to aid in the court's inquiry. (*Smith* v. *Municipal Court*

(1978) 78 Cal.App.3d 592, 596 [144 Cal.Rptr. 504]; *Bosco* v. *Justice Court* (1978) 77 Cal.App.3d 179, 183 , fn. 2 [143 Cal.Rptr. 468].) Under the first prong, the court examines the nature of the offense and/or the offender, paying particular attention to the danger each poses to society. (*In re Lynch, supra,* 8 Cal.3d at p. 425.) Secondly, the court may compare the challenged punishment with punishments prescribed for other, more serious, crimes in the same jurisdiction. (*Id.,* at p. 426.) Finally, the challenged penalty may be compared with punishments for the same offense in other jurisdictions. (*Id.,* at p. 427.)

In applying the first prong of the test, the court may look at such factors as the amount of gain involved, the violence or nonviolence of the crime, and whether anyone was injured in its commission. (*Id.,* at p. 425.) The evaluation of the defendant's culpability includes consideration of both the injury to the victim and to society. (See *In re Grant* (1976) 18 Cal.3d 1, 10 [132 Cal.Rptr. 430, 553 P.2d 590].)

Another consideration under the first prong is the penological purposes of the prescribed punishment. (*In re Foss* (1974) 10 Cal.3d 910, 919-920 [112 Cal.Rptr. 649, 519 P.2d 1073].) *Lynch* and some of its early progeny involved the indeterminate sentencing law, which had as one of its main purposes rehabilitation of the offender. (*In re Eric J.* (1979) 25 Cal.3d 522, 531 [159 Cal.Rptr. 317, 601 P.2d 549]; *Way* v. *Superior Court* (1977) 74 Cal.App.3d 165, 169 [141 Cal.Rptr. 383].) Thus, the court looked long and hard at the nature of the offender and whether the prescribed penalty would aid or hinder his or her rehabilitation; a punishment which did not meet the goal of rehabilitation might be declared unconstitutional on its face. (E.g., *In re Foss, supra,* 10 Cal.3d 910.)

However, the current determinate sentencing laws emphasize punishment rather than rehabilitation and fix determinate terms without regard for the characteristics of the individual offender. (*Smith* v. *Superior Court, supra,* 78 Cal.App.3d at pp. 598-599; see Pen. Code, § 1170, subd. (a)(1); *In re Eric J., supra,* 25 Cal.3d at p. 531; *Way* v. *Superior Court, supra,* 74 Cal.App.3d at p. 169.) Under the new law, the characteristics of the offender appear to weigh more heavily in determining whether a punishment is unconstitutional as applied, rather than on its face. (See, e.g., *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697].)

Pandering, as defined in section 266i, includes a broad spectrum of behaviors and degrees of culpability. Proscribed behavior ranges from procuring another for the purpose of prostitution (subd. (a)) or by promises encouraging another to become a prostitute (subd. (b)) to the use of threats or violence to induce another to become a prostitute (subd. (b)) or receiving

money for procuring another for the purpose of prostitution (subd. (f)). (7) The statute is an attempt " 'to cover all the various ramifications of the social evil of pandering and include them all in the definition of the crime, with a view of effectively combating the evil sought to be condemned.' " (*People v. Charles* (1963) 218 Cal.App.2d 812, 816 [32 Cal.Rptr. 653], quoting from *People* v. *Montgomery* (1941) 47 Cal.App.2d 1, 24 [117 P.2d 437].) It is "designed to discourage prostitution by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes." (*People* v. *Hashimoto* (1976) 54 Cal.App.3d 862, 867 [126 Cal.Rptr. 848].)

As noted in George, *Legal, Medical and Psychiatric Considerations in the Control of Prostitution* (1962) 60 Mich. L.Rev. 717 (hereafter George), "[o]f all the groups [involved with prostitution] reached by penal law, penal sanctions are most appropriately and usefully levied against those who pander. The pander[er] facilitates entry into and practice of prostitution . . . ; his [or her] forcible removal therefore reduces the number of recruiters of those who are only latent prostitutes into the ranks of the confirmed. The convicted pander[er] probably will not be reformed, and the cause of his [or her] activity may in fact be in part psychological, but at least he [or she] will be kept out of circulation for a time, and upon his [or her] release . . . will probably be an object of considerable police interest in his [or her] future activities. . . ." (At p. 757, fn. omitted.)

█ In the instant case, defendant sought out Isgro, an acquaintance, and repeatedly attempted to interest Isgro in becoming a part-time prostitute. Defendant did not use force, threats or violence, a fact which places her conduct at the lower end of the range of culpability. Nevertheless, it involved encouraging another—who worked in law enforcement and had not previously expressed an interest in practicing prostitution—to become a prostitute and facilitating her entry into prostitution. While Isgro did not suffer the injuries which might have resulted had she actually become a call girl, she was bothered by defendant's repeated attempts to contact her at work and concerned contact with defendant might jeopardize her job. Thus, there was some injury to the victim of the crime.

There also was personal gain involved. Although defendant would not receive any money for arranging Isgro's contact with Harry—Isgro was to keep all the money she earned—yet she would benefit by pleasing Harry and his friend, Bill. Harry gave her free automotive work and Bill had the connections which could aid defendant in her writing career. While the amount of gain cannot be measured monetarily, it undeniably was there.

Based on the foregoing, and bearing in mind the purpose of the penalty is punishment, we cannot conclude the denial of probation and mandatory

prison sentence is grossly disproportionate to the instant offense. The offense is one which the Legislature has determined to be detrimental to society, and the mandatory prison sentence is the means by which the Legislature has determined to discourage such behavior. As noted in George, *supra,* at page 757, this is an appropriate remedy.

Turning to the second prong of the *Lynch* test, inasmuch as the challenged punishment here is denial of probation, rather than the length of the sentence, the comparison to be made is with other Penal Code provisions granting or denying probation to other offenders. (See *In re Grant, supra,* 18 Cal.3d at p. 15.) ▮ It must be borne in mind, however, that probation is a privilege, not a right (*People* v. *Main* (1984) 152 Cal.App.3d 686, 693 [199 Cal.Rptr. 683]; accord *People* v. *Tanner* (1979) 24 Cal.3d 514, 519 [156 Cal.Rptr. 450, 596 P.2d 328]), and denial of probation or imposition of a mandatory minimum period of imprisonment is not, in and of itself, cruel or unusual punishment (*Bosco* v. *Justice Court, supra,* 77 Cal.App.3d at p. 188). Moreover, it is within the power of the Legislature to determine whether probation may be allowed to one convicted of a particular crime; the courts have no inherent power to grant probation. (*People* v. *Enriquez* (1985) 173 Cal.App.3d 990, 996 [219 Cal.Rptr. 325]; *People* v. *Westoby* (1976) 63 Cal.App.3d 790, 798 [134 Cal.Rptr. 97].) Where probation is disallowed but there are mitigating factors present, the courts may exercise their discretion by selecting the lower terms of imprisonment. (See *People* v. *Gayther* (1980) 110 Cal.App.3d 79, 88-89 [167 Cal.Rptr. 700].)

▮ Additionally, it must be remembered "[t]he Constitution does not require, nor is it reasonable to expect, perfect symmetry in a scheme of criminal proscription and punishment enacted in response to ever-changing problems evolving over the 125-year history of the state. Assessment of the comparative evil and comparative danger attached to diverse forms of anti-social conduct remains a uniquely legislative function into which [the] court may plunge only in clear instances of gross and indefensible miscalculation." (*People* v. *Serna* (1975) 44 Cal.App.3d 717, 720-721 [118 Cal.Rptr. 904].) That some statutes may be less harsh than others does not necessarily make the harsher punishment cruel or unusual. (*Bosco* v. *Justice Court, supra,* 77 Cal.App.3d at p. 187; *People* v. *Gayther, supra,* 110 Cal.App.3d at p. 89.) Thus, where a lesser penalty is prescribed for "more serious" crimes, i.e., those demanding more culpability, the other prongs of the *Lynch* test are generally taken into account when determining whether the disproportionality is unconstitutional. (*People* v. *Wingo, supra,* 14 Cal.3d at pp. 178-179.)

▮ Penal Code section 1203.065, subdivision (a), which proscribes probation for one convicted of pandering, carries the same proscription for those convicted of other sex offenses: pimping (Pen. Code, § 266h); procure-

ment or persuasion of a child under age 14 to engage in lewd or lascivious acts (§ 266j); employment of a minor under age 17 for modeling or a performance showing sexual conduct (§ 311.4, subd. (c)); rape by means of force or fear (§ 261, subd. (2)); rape or violation of section 289 by a defendant acting in concert by force or violence (§ 264.1); and sodomy or oral copulation by force, violence, duress, menace or threat of great bodily harm (§§ 286, 288a). Probation also is denied to certain violators of section 288, commission of lewd or lascivious acts with a child under age 11. (§ 1203.066.)

Probation may not be granted to those who commit certain felonies while using a firearm (§ 1203.06, subd. (a)), who intentionally inflict great bodily injury during the commission of the felony (§ 1203.075), or who, during the commission of the crime, inflict great bodily injury on a victim who is age 60 or older, blind, paraplegic or quadriplegic (§ 1203.09). Some recidivists are denied probation. (§§ 1203.06, subd. (a)(2); 1203.066, subd. (a)(5); 1203.07, subd. (a)(3); 1203.08; 1203.085.) Also, probation may not be granted to persons convicted of selling or possessing for sale certain amounts of heroin, phencyclidine (PCP) or other controlled substances, of manufacturing or possessing ingredients for manufacturing PCP, or using or encouraging a minor in certain PCP-related offenses. (§ 1203.07.)

The crimes for which probation is denied fall roughly into four categories: "serious" felonies involving use of a firearm or great bodily injury to the victim, violent sex offenses, sex and drug offenses involving minors, and other sex and drug offenses. The last category, which includes the instant offense of pandering, may not involve "innocent victims," as do the crimes in the other categories; they way not even involve a "victim," as in the case of possession of the ingredients for manufacturing phencyclidine. These crimes nevertheless may be considered " 'serious and deadly offense[s] against society.' " (*People* v. *Madden* (1979) 98 Cal.App.3d 249, 255 [159 Cal.Rptr. 381].) *Madden,* which involves the sale of heroin, notes that the recipients of heroin are endangered by its use, its sale gives rise to other criminal offenses to provide the recipients with money for their purchases; even though the crime does not directly involve violence, it may lead to death, illness or other crimes which may involve violence. (*Ibid.*) For this reason, the Legislature could reasonably classify it as a serious offense. (*Ibid.*)

As with the sale of heroin, pandering may not directly injure the victim, but it may lead to the victim's death, illness or involvement in other crimes. (See Jennings, *The Victim as Criminal: A Consideration of California's Prostitution Law* (1976) 64 Cal.L.Rev. 1235.) Additionally, prostitution is viewed as "immoral to an offensive degree, condemn[ing] women to a degrading existence which will make social derelicts of them within a relatively short period of time and is a major source of disease." (George, *supra,* 60 Mich. L.Rev. at p. 744.) Because of the effects of prostitution upon those involved

in it, pandering, which brings people into a life of prostitution, may reasonably be classified as a serious offense, even when it does not directly involve violence, and an appropriate penalty, such as denial of probation, may be prescribed.

Defendant points to a number of other offenses which she characterizes as more serious than the instant offense, but the conviction of which does not preclude probation for the violator. She lists the offense specified in section 288, commission of lewd or lascivious acts against a child under age 14; however, as previously noted, probation may be denied many violators of this section under section 1203.066, rather than under section 1203.065 which prohibits probation for panderers.

Probation is available to those who commit spousal rape (§ 262), a potentially violent crime. However, there is a rational reason for such preferential treatment: there is a greater potential for rehabilitation of such rapists and for rebuilding their relationships with their spouses and families. (*People* v. *Acevedo* (1985) 166 Cal.App.3d 196, 204-205 [212 Cal.Rptr. 328].)

Abduction by force, menace or duress for marriage or defilement (§ 265) or to live in an illicit relationship (§ 266b), although they may involve more force against the victim than pandering, do not involve prostitution and its attendant evils. For this reason, the Legislature may have determined a lesser penalty—allowance of probation—than that prescribed for pandering was appropriate.

Violation of section 266g includes placing or permitting the placement of one's wife in a house of prostitution, leaving her there or permitting her to remain there. While placing one's wife in a house of prostitution is as reprehensible as pandering, merely permitting her to remain there does not require as much culpability. Inasmuch as the statute may be violated by such inaction, the Legislature could have taken this into account in allowing probation for violators.

Unlawful sexual intercourse, oral copulation or sodomy where consent is induced by false or fraudulent representation with intent to create fear (§ 266c) does not involve violence, although it does involve some degree of coercion. It is not necessarily more serious than pandering, so a lesser punishment may be appropriate.

Abduction or procurement by fraudulent inducement for the purpose of prostitution (§ 266a), or taking away a person under age 18 from the person's guardian, without the guardian's consent, for the purpose of prostitution (§ 267) are of similar seriousness as pandering, yet one convicted of these

offenses is eligible for probation, making the penalty for pandering harsher than those prescribed for these offenses.

There also is a possibility of probation for those who commit other offenses, which may not involve sexual conduct, and which might be considered more serious than pandering. For example, unarmed robbers, burglars, arsonists or some rapists may be eligible for probation. Even those who commit the above offenses, as well as murder, kidnapping or assault with intent to commit murder, while armed with a weapon other than a firearm may be given probation in unusual cases where the interests of justice will best be served thereby. (§ 1203, subd. (e)(1).)

That some sex offenses similar to pandering have lesser penalties may be more indicative of a legislative oversight resulting from the piecemeal enactment of criminal penalties, rather than indicative of a gross disproportionality of punishment requiring judicial intervention. (See *People* v. *Serna, supra,* 44 Cal.App.3d at pp. 720-721.) More difficult is the fact probation may be allowed in certain circumstances for those who commit violent and serious felonies, but it is absolutely prohibited for those convicted of pandering. While pandering may be considered a serious crime, these other crimes may be viewed as more serious, yet a lesser penalty is prescribed. That a lesser penalty is available for those who commit the more serious crimes is indicative of a disproportionate punishment, but this in itself does not establish the harsher penalty as cruel or unusual. (*People* v. *Wingo, supra,* 14 Cal.3d at pp. 178-179.)

Turning finally to the third prong of the *Lynch* test, it may be noted the test is based on the assumption "the vast majority of [other] jurisdictions will have prescribed punishments for this offense that are within the constitutional limit of severity; and if the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness." (*In re Lynch, supra,* 8 Cal.3d at p. 427.) The courts should not, however, give undue deference to the conclusions of other state legislatures as to the severity of an offense. (*Smith* v. *Municipal Court, supra,* 78 Cal.App.3d at p. 600.) Constitutional interference is required only when California's punishments stray "from the ' "virtually unanimous judgment of our sister states" ' " or are grossly excessive in relation to the rest of the nation. (*People* v. *Main, supra,* 152 Cal.App.3d at p. 696.)

According to the figures compiled by the parties, four states do not have criminal statutes proscribing the type of behavior at issue here. (Maryland, Massachusetts, Minnesota and Virginia.) Twenty-two states class the

offense as a misdemeanor and impose penalties ranging from a simple fine to one year imprisonment plus a fine.[4]

Twenty-four states and the District of Columbia consider pandering a felony. The majority of these provide for a prison term in the one to five year range. Where a minimum term of imprisonment is prescribed, two states require six months' imprisonment (Ohio, Rhode Island), six states make it one year (Arizona, Connecticut, Illinois, North Carolina, Nevada, Wyoming), three states have a two-year minimum sentence (Idaho, Indiana, Missouri) and only one other state besides California, New Jersey, sets the minimum term at three years.

While the maximum term in most states is five years, four have lesser maximum terms of two and one-half or three years. (Arizona, Illinois, North Carolina, Wyoming.) Six have greater maximums: Nevada shares a six-year maximum with California, two states have seven-year maximum terms (Delaware, Pennsylvania), Indiana has an eight-year maximum, and two states have twenty-year maximum terms (Idaho, Michigan).

It does not appear that any other state prohibits probation for those convicted of pandering. In this regard, California's punishment is more severe than that of its sister states. However, the actual punishment received by panderers in California—a term of imprisonment of three, four or six years (Pen. Code, § 266i)—is comparable to penalties which may be received in much of the rest of the nation. While on the high side, it is not grossly excessive in relation to the other states (roughly half the nation) which consider pandering a felony. Thus, the third prong of the test does not indicate constitutional interference is required. (*People* v. *Main, supra,* 152 Cal.App.3d at p. 696.)

While the punishment for pandering in California is undoubtedly harsh, particularly where, as here, the crime does not involve force or violence and falls at the lower end of the range of culpability, we cannot say it is so disproportionate to the crime that it "shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch, supra,* 8 Cal.3d at p. 424.) The Legislature clearly considers pandering a serious crime, most appropriately punished by a prison term, and this punishment is not so far out of proportion to the offense as to allow judicial interference. (*Id.,* at pp. 423-424.) Consequently, we hold section 1203.065, as it applies to a conviction of pandering in violation of section 266i, is not unconstitutionally cruel or unusual on its face.

---

[4]These states are: Alabama, Alaska, Arkansas, Colorado, Florida, Georgia, Hawaii, Kansas, Kentucky, Maine, Mississippi, Montana, New Hampshire, New Mexico, New York, North Dakota, Oklahoma, South Carolina, Tennessee, Texas, Vermont and West Virginia.

The question remains whether it is unconstitutional as applied in the instant case, as the trial court found. Our inquiry focuses on the individual defendant, as well as her crime, in particular "whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as [her] age, prior criminality, personal characteristics, and state of mind." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.) Weighing most heavily in defendant's favor in the mind of the trial court were defendant's age—33 — her lack of prior criminal convictions, the nature of her particular offense, i.e., its distance from the seamiest elements of prostitution, and the recommendation of the probation department and Department of Corrections that defendant be given probation.

Defendant's age does not count as a factor in her favor. It was a factor in *Dillon,* where defendant was only 17 and immature, functioning like a younger child. (*Id.,* at pp. 483, 488.) Defendant here is an adult; there is no evidence of immaturity or other considerations which would render her less culpable on account of her age. She also was educated, a high school graduate with college credits, and had 10 years' experience working as a traffic officer for the Los Angeles Police Department. Her age, education and experience do not call for special treatment.

Moreover, unlike the defendant in *Dillon,* who because of his immaturity was unable to see the risk his conduct created or to extricate himself from the dangerous situation in which he found himself without panicking (*id.,* at p. 488), defendant here was well aware of the risk she created when she contacted Isgro and encouraged her to become a prostitute. In her September 9 conversation with Isgro, defendant stated: " . . . I'm placing myself in a great deal of jeopardy by even mentioning this to you . . . ." In a conversation on September 16, defendant asked Isgro: "You wouldn't set me up, would you?" Isgro asked for an explanation, and defendant indicated she meant Isgro wouldn't inform the vice officers. Defendant further explained she was concerned, in that a friend of hers was "busted" the previous night because the friend did something "stupid," taking a call from someone she did not know without checking it out first. Defendant averred: " . . . I don't plan to do anything stupid. The most stupid thing I'm doing is . . . is doing this with you." Clearly, defendant realized the jeopardy she was placing herself in by arranging for Isgro to become a prostitute for Harry.

It is true defendant had no previous criminal convictions. However, she freely admitted prior criminality; she told both the probation department and the Department of Corrections she was a prostitute or "call girl." She also indicated she planned to continue in prostitution, which she believed should be legalized, when returned to the community. She did, however, state the intention to desist from any further pandering activity, which she recognized as a serious offense.

Additionally, defendant's conduct was premeditated, not a spontaneous response to a developing situation as in *Dillon*. (*Ibid*.) Defendant contacted Isgro, extolled the virtues of a career in prostitution, raised the possibility of Isgro's becoming a prostitute and, finally, arranged the "date" for Isgro. Isgro was selected because she possessed the characteristics Harry, the customer, found desirable, and her services were arranged by defendant.

Based on the foregoing, we cannot conclude the punishment of imprisonment is grossly disproportionate to defendant's culpability. She knew what she was doing, she knew there were risks, but she went ahead with the crime. Although the probation department and Department of Corrections noted she was otherwise a good candidate for probation, nothing in the record mandates such lenient treatment. Accordingly, the trial court erred in finding section 1203.065 unconstitutional as applied to defendant and in granting her probation.

## II

The People further contend defendant should be resentenced according to law. Again, we agree.

This contention is made in response to defendant's assertion it would be unfair to sentence her to prison, in that she already has complied with the terms of her probation. Defendant relies on *People v. Tanner, supra,* 24 Cal.3d 514, in which the trial court erred in sentencing defendant to county jail and probation rather than state prison. (At p. 521.) In determining the disposition of the case on appeal, the court noted, "given the unusual post-conviction manner in which the issue of judicial discretion has been presented and finally resolved, it follows Mr. Tanner should not necessarily be committed to prison. The uncertainty arising from the rule of law resulting in the trial court's erroneous disposition, has created both an unusual burden on defendant and a dilemma for this court. Simply put, is it not unfair to require Mr. Tanner to now serve a second term for his criminal act?" (*Ibid*.) The court concluded it would be unjust that defendant, having complied with the conditions of his probation including service of one year in jail, be incarcerated for a second time. (*Id.*, at p. 522.)

A similar result was reached in *People v. Holt* (1985) 163 Cal.App.3d 727 [209 Cal.Rptr. 643]. Defendant was granted probation erroneously; pending appeal, he served a one-year county jail term imposed as a condition of probation, was returned to the community and was progressing satisfactorily on probation. The court observed if defendant was sentenced to state prison, after application of credits he would serve only eight or nine months; the court concluded it would be cruel and unusual punishment to subject defendant to a second incarceration. (At p. 734.)

*Tanner* and *Holt* appear to be the exceptions, rather than the rule, based upon the unique circumstances in each case, including the fact the defendants had served their full jail terms pending appeal. Previously, in *People v. Warner* (1978) 20 Cal.3d 678 [143 Cal.Rptr. 885, 574 P.2d 1237], the Supreme Court allowed resentencing of a defendant who erroneously had been granted probation, even though he already had been on probation for two years. (At p. 689.)

*People* v. *Gonzales* (1979) 96 Cal.App.3d 725 [158 Cal.Rptr. 205] indicates *Tanner* is based on the peculiar fact pattern before the court but is silent with reference to other defendants erroneously placed on probation. (At p. 727; accord *People* v. *Ibarra* (1980) 114 Cal.App.3d 60, 66, fn. 5 [170 Cal.Rptr. 440].) In light of *Warner,* the court opined *Tanner* does not stand for the proposition it always is unjust to require one erroneously placed on probation to be sentenced to imprisonment. (96 Cal.App.3d at p. 728.) Moreover, such a blanket rule of law effectively would negate the People's right to appeal from the erroneous granting of probation. (*Ibid.*) No unusual fact pattern being present in *Gonzales,* the court reversed the erroneous order granting defendant probation and remanded for further sentencing. (*Ibid.*)

In *People* v. *Enriquez, supra,* 173 Cal.App.3d 990 , the trial court erroneously granted defendant probation on the condition she serve nine months in county jail. On appeal, she argued it would be unjust to require her to serve a prison sentence, inasmuch as she had completed her nine-month jail term. The court disagreed, "deem[ing] it neither unfair nor unjust on the record before [it] that defendant . . . should serve the term prescribed by law even after having suffered confinement as a condition of erroneously granted probation. Defendant argued for probation in the face of a clear statute providing otherwise. Her momentary victory should not have been viewed by her as clear cut or impregnable. 'When a defendant's own actions or actions in which [s]he has acquiesced have caused the delay between the commission of the crime and the entering of prison, [s]he ordinarily will not be heard to contend that the delay constitutes cruel and unusual punishment.' (*United States* v. *Albanese* (2d Cir. 1977) 554 F.2d 543, 549 .)" (173 Cal.App.3d at p. 999.)

In the instant case, as in *Enriquez,* defendant was well aware of the mandatory prison term prescribed by statute as punishment for her offense when she argued for probation. Moreover, she was not required to serve a jail term as a condition of probation. While her probation was conditioned upon her spending 72 days in county jail, this was time *already served* for the purpose of the diagnostic study by the Department of Corrections. It was not a jail term imposed as punishment. Defendant also was required to perform 120 hours of community service and to obtain psychological counseling; the record does not reveal whether these conditions have been fulfilled. These

circumstances present no special fact situation which would render it unfair or unjust for defendant to be resentenced and required to serve a prison term.

The order is reversed and the case remanded for resentencing.

Lucas, J., concurred.

**SPENCER, P. J.**—I respectfully dissent. While I agree with the majority that Penal Code section 1203.065 is constitutional on its face, I would affirm the trial court's order on the ground section 1203.065 is unconstitutional as applied to defendant.[1]

As the majority observes at pages 740-741, *ante,* the statutory definition of pandering encompasses a broad range of behaviors and degrees of culpability. In its effort to combat pandering, the Legislature has provided no one convicted of the crime may be given probation, no matter which end of the spectrum his or her behavior falls into. (§ 1203.065, subd. (a).) Thus, in some instances, this penalty may violate the constitutional prohibition against cruel or unusual punishment. (Cal. Const., art. I, § 17.)

As noted in *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-478 [194 Cal.Rptr. 390, 668 P.2d 697]: "The matter is governed by *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921] . . . , and its progeny. As in *Lynch* (at p. 414), 'We approach this issue with full awareness of and respect for the distinct roles of the Legislature and the courts in such an undertaking. We recognize that in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and that such questions are in the first instance for the judgment of the Legislature alone. [Citations.] [¶] Yet legislative authority remains ultimately circumscribed by the constitutional provision forbidding the infliction of cruel or unusual punishment, adopted by the people of this state as an integral part of our Declaration of Rights. It is the difficult but imperative task of the judicial branch, as coequal guardian of the Constitution, to condemn any violation of that prohibition. As we concluded in *People* v. *Anderson* (1972) 6 Cal.3d 628, 640 [100 Cal.Rptr. 152, 493 P.2d 880] . . . , "The Legislature is thus accorded the broadest discretion possible in enacting penal statutes and in specifying punishment for crime, but the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function." ' "

Under *Lynch,* a punishment is cruel or unusual if "it is so disproportionate

---

[1]*People* v. *Freeman* (1987) 188 Cal.App.3d 618 [233 Cal.Rptr. 510], decided by Division Four of this district, reaches the same conclusion, holding section 1203.065 is constitutional on its face but, as applied, was cruel or unusual punishment.

to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (8 Cal.3d at p. 424.) "Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' . . . ." (*Id.*, at pp. 423-424.)

The *Lynch* court fashioned several tests to aid in determining proportionality, one of which is especially relevant when examining whether a particular punishment is unconstitutional as applied. (*People* v. *Dillon, supra,* 34 Cal.3d at p. 479.) This test focuses on the nature of the offense and/or offender, paying particular attention to the danger each poses to society. (*In re Lynch, supra,* 8 Cal.3d at p. 425.) In examining the nature of the offense, the court looks at the totality of the circumstances surrounding the crime, including the amount of gain involved, the violence or nonviolence of the crime and whether anyone was injured in its commission. (*Ibid.*; see *In re Foss* (1974) 10 Cal.3d 910, 919 [112 Cal.Rptr. 649, 519 P.2d 1073].) Inquiry into the nature of the offender focuses on "the defendant's individual culpability as shown by such factors as his [or her] age, prior criminality, personal characteristics, and state of mind." (*People v. Dillon , supra,* 34 Cal.3d at p. 479.)

The crime here involved no financial gain, no threats, coercion or violence, and no injury. Defendant sought out Isgro, who agreed to meet with defendant out of curiosity; defendant described her life as a call girl and offered to set Isgro up in the same line of work. Only when Isgro expressed further interest did defendant begin to arrange for Isgro's "date" with Harry. Clearly, defendant's acts fell at the lowest end of the spectrum of culpability under section 266i.

Additionally, as the trial court observed, this crime did not involve the type of public activity, e.g., solicitation on Hollywood Boulevard, which carries the greatest potential for public offense. (See Jennings, *The Victim as Criminal: A Consideration of California's Prostitution Law* (1976) 64 Cal.L.Rev. 1235, 1248.) The arrangements were made privately and discreetly.

In considering defendant's personal characteristics, the trial court emphasized her age and lack of prior criminal convictions. It also relied upon the recommendations of the probation department and Department of Corrections that defendant was a good candidate for probation.

I agree with the majority defendant's age cannot be considered a factor in her favor under *Dillon*. (At page 747, *ante*.) However, factors in defendant's favor are her lack of a prior criminal record or history of violence or antisocial behavior. Her criminal activity as a prostitute was of recent origin and followed a period of stable employment and living arrangements. These factors influenced the recommendation that defendant be given probation. Additionally, it was the Department of Corrections's view defendant would desist from criminal activity; while she might return to prostitution following probation, she was not likely to repeat any pandering activity.

The trial court took these factors into consideration in placing defendant on probation. It informed defendant she was "out of the prostitution business at this point," and required her to obey "all laws, orders, rules and regulations of the probation department and of the court." This requirement of probation, plus the requirement she obtain approved education or employment, serve to assist in defendant's rehabilitation and distance her from her recent criminal activity. Her failure to follow through with these requirements will result in the revocation of her probation and imprisonment.

In addition, the Department of Corrections's report stressed defendant's need to obtain psychological counseling. The trial court's order, which required defendant to obtain such counseling, was designed to meet defendant's needs and lead to her rehabilitation.

The nature of defendant's offense, her low level of culpability, her lack of a prior criminal record and amenability to probation support the trial court's conclusion. A mandatory term of imprisonment in state prison for at least three years (§ 266i) is " 'out of all proportion' " to defendant's offense (*In re Lynch, supra*, 8 Cal.3d at pp. 423-424). Therefore, I would hold section 1203.065, as applied to defendant, is cruel or unusual punishment in violation of article I, section 17 of the California Constitution.

A petition for a rehearing was denied April 13, 1987. Spencer, P. J., was of the opinion that the petition should be granted. Respondent's petition for review by the Supreme Court was denied June 25, 1987. Mosk, J., Broussard, J., and Kaufman, J., were of the opinion that the petition should be granted.